**Virginia ZURAD, Plaintiff-Appellant,**

v.

**LEHMAN BROTHERS KUHN LOEB INCORPORATED and William Curry, Defendants-Appellees.**

**No. 83–2773.**

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1984.

Decided March 12, 1985.

As Amended on Denial of Rehearing and Rehearing En Banc May 10, 1985.

David Bortman, Bortman, Meyer & Dasiell, Chicago, Ill., for plaintiff-appellant.

Michael W. Coffield, Coffield, Ungaretti, Harris & Salvin, Janet M. Koran, Hannafan & Handler, Ltd., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Plaintiff, Virginia Zurad, filed a five-count complaint against Defendants Lehman Brothers Kuhn Loeb Inc. (Lehman Brothers) and William Curry, a salesman at Lehman Brothers. The complaint alleged (1) violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.-10b–5, (2) violation of the New York Stock Exchange (NYSE) "Know Your Customer" rule, (3) violation of the "suitability" rules of the National Association of Securities Dealers (NASD), and, as pendent state law claims, (4) common law fraud, and (5) negligent misrepresentation.

Before trial the district judge dismissed counts (2) and (3) of the complaint on the ground that no implied private right of action exists under NYSE or NASD rules.

Following a two-day bench trial, Zurad moved to amend her complaint to add two new counts, one alleging breach of fiduciary duty and the other alleging negligence. The district judge denied the motion, made findings, and entered judgment for defendants and against plaintiff on the three remaining counts. Zurad appeals. We reverse, deeming clearly erroneous the finding that Curry exercised reasonable care in supplying information to Zurad. Although some discussion of the 10b–5 claim remains appropriate, we need not, because of the disposition of the negligent misrepresentation claim, resolve the 10b–5 claim with finality, nor reach the several other allegations of error.

## I. FACTS

This case arises out of the purchase and subsequent sale of 5,000 shares of Walter E. Heller International Corporation (Heller) stock by Zurad through defendant Lehman Brothers.

At the time of the events complained of, appellant Zurad was 54 years old and had been employed by the United States Postal Service for over twenty years as a mail handler and sorter. She was earning $18,-000 a year. At the time she opened her

account at Lehman Brothers her net worth totaled approximately $110,000. About $20,000 came from inheritance. She kept her money in a bank until about 1976 or 1977.

Zurad had some experience in the stock-market before she opened an account at Lehman Brothers. Prior to her commencement of trading in common stock and options in 1977, she invested in a mutual fund through Hornblower Weeks Hemphill Noyes (Hornblower Weeks). Zurad subsequently left Hornblower Weeks when she saw a television commercial for the firm and believed that she was the person being referred to by the brokers in the commercial. In 1977 Zurad opened an account with Merrill Lynch, Pierce, Fenner & Smith (Merrill Lynch). There she traded in options and also opened a margin account. In May 1978, after losing approximately $15,000 at Merrill Lynch, she transferred her account to Dean Witter Reynolds & Company (Dean Witter), where she purchased stock in Abbott Laboratories. After some dispute with her Dean Witter broker over the amount of Abbott stock to be purchased—the broker advising Zurad to purchase only 1,000 shares, and Zurad insisting on 2,000 shares, Zurad ultimately purchased 2,000 shares. Zurad also purchased 1,000 shares of Sears, Roebuck & Company (Sears) through Dean Witter, which were eventually sold, at a point earlier than that suggested by her broker, for a $3,000 loss. Zurad closed her account at Dean Witter after approximately six months.

Zurad testified that while holding the Sears shares, she followed the price in the newspaper. She also indicated that she occasionally purchased a newspaper. She sometimes checked price quotations but only rarely looked at the rest of the financial section before the purchase of Heller stock.

The district judge found that while Zurad was not a sophisticated investor (in one colloquy he said "a long ways from a sophisticated investor") she did have substantial experience in the stock market and at least a moderate understanding of the complexities of stock market transactions. He also concluded, based on Zurad's dealings with the Abbott and Sears stock at Dean Witter, that she sometimes entered into transactions on her own volition and contrary to the advice of her broker.

In late 1978 or early 1979, Zurad went to the Chicago office of Lehman Brothers on an unsolicited basis and asked for a broker to handle her account. Zurad was referred to Curry, a registered broker/dealer. Zurad did not open an account at this initial meeting.

On or about January 24, 1979 Zurad telephoned Curry and requested that he handle her account. Zurad opened a cash account, transferring into it the following: $26,803 in cash, 2,000 shares of Abbott, 45 shares of Walt Disney Productions and 45 shares of International Business Machine Corp. (IBM). Zurad informed Curry that she had investable funds of approximately $100,-000. She also told him that she was a postal worker and that her investment objectives included income production, financial growth and the recoupment of previous losses.

On February 21, 1979 Zurad telephoned Curry and arranged for a meeting at the Lehman Brothers' office. Although Zurad contended at trial and in her brief before this court that Curry recommended that she increase her holdings in Abbott to 5,000 shares at this meeting, the trial court found that the idea originated with Zurad based upon her deposition testimony, Curry's testimony at trial and the parties' joint stipulation of uncontested facts. Curry expressed his concern to Ms. Zurad over the risks of trading on margin, but she nevertheless executed a margin agreement with Lehman Brothers at this meeting. On March 6, 1979, pursuant to Zurad's instructions, Curry purchased an additional 3,000 shares of Abbott.

In late May and throughout June, 1979, several articles appeared in the *Chicago Tribune*, the *Chicago Sun Times*, *The Wall Street Journal* and *The New York Times*, reporting that Heller, the owner of

the American National Bank, was the target of a takeover. On June 29, 1979 the company interested in purchasing Heller was identified as the Midland Bank, Ltd., of London, England (Midland). Several newspaper articles reported that Midland would offer holders of Heller shares $42.50 per share plus retained earnings. There is nothing in the record to show that Zurad read these stories, and she testified that she had no knowledge of them.

In late June or early July, 1979, Curry telephoned Zurad and asked her to meet with him. He told her of the potential Heller-Midland merger, and that it was going through a federal approval process. At this point, the parties' versions of events differ sharply. Zurad testified in substance that Curry represented he had confidential information from a friend at American National Bank, owned by Heller, that the merger would take place; she did not think there was anything improper in his telling her. Curry denied the claimed representation, saying that in casual conversation he had told her of a deceased relative of his wife who had been a director of the bank. The court did not resolve this conflict. Curry testified that he advised Zurad to sell 2,000 shares of Abbott and buy 2,000 shares of Heller, but that two weeks later she instructed him to sell 5,000 shares of Abbott and buy 5,000 shares of Heller. Zurad testified that Curry's recommendation was always 5,000 shares. The district court found that Curry recommended 2,000.

Zurad also testified that Curry did not tell her that there had been newspaper stories concerning the merger; that the price per share of Heller had recently increased from $17 to $30; and, that a flurry of trading in the stock had caused the New York Stock Exchange to suspend trading twice. Curry admitted that he had never told Zurad that the price had risen dramatically and trading had been suspended. He had never advised her that Heller was a dangerous investment. It was his own opinion that the stock had been undervalued.

On July 13 and 17, 1979 Curry purchased 5,000 shares of Heller for Zurad's account at a price of $30⅞ per share for a total of $155,746.59, including commission.

On October 22, 1979 the proposed merger between Heller and Midland was called off, negotiations were terminated and the New York Stock Exchange issued a stop trading order. At that time Heller stock was trading at $28¼ per share. When the market opened on October 23, the price of Heller stock had dropped to $18¼.

On March 25 and April 4, 1980 Curry, at Zurad's direction, sold the 5,000 shares of Heller stock at prices from $16⅛ to $17 per share. Zurad realized $79,855.10, incurring a loss of $75,891.49.

There is conflict in the testimony as to the period after October 22, 1979. Zurad's testimony indicated that Curry let her believe the merger was still on. Curry testified otherwise, and the court found in his favor. Zurad had Curry carry out transactions for her in May and July, 1980. She then made some complaint concerning him and was transferred to another Lehman broker who effected transactions for her in August 1980, after which she closed her account.

We have referred to several conflicts in testimony concerning the content of conversations, resolved by the findings of the district court. Although plaintiff challenges these findings, they are not clearly erroneous.

Our problem is, in part, that the court made no finding whether Curry represented that he had confidential inside information, admittedly a false representation if made, and, in part, whether the finding of no negligent misrepresentation be clearly erroneous.

## II. RULE 10b–5 INSIDE INFORMATION CLAIM

Plaintiff asserted a 10b–5 claim, based upon her assertion that Curry represented he had inside information that there would be an advantageous merger of Heller. Curry denied making the representation, which was clearly false, if made. The dis-

trict court did not make a finding on this issue, but disposed of the claim on alternative grounds: (1) that Zurad could not reasonably have relied on the misrepresentation, if made, because news of the merger had been publicly disseminated on a widespread basis in newspapers of general circulation and (2) that in any event she could not be granted recovery because she would be *in pari delicto.*

Proposition (1) rests on an assumption that Zurad was or should have been aware of the relevant news stories. Nothing in the record supports that assumption, and she testified to the contrary. She was, as has been said, an $18,000 per year mail handler and sorter. She had engaged in a small number of stock market transactions through several brokers, and was able to and occasionally did find market quotations in the newspaper. In our opinion it was clearly erroneous to hold her to knowledge of news stories concerning a particular corporate merger appearing from time to time during the month of June, 1979, before there was any reason for her to be aware of the company.

Proposition (2) raises a legal question of considerable difficulty. This court has not taken a position on the *in pari delicto* defense in like cases and other courts have differed on the matter. *See Tarasi v. Pittsburgh National Bank,* 555 F.2d 1152 (3rd Cir.1977) (upheld order granting summary judgment on the theory that investors were *in pari delicto* with the "tipper" because they voluntarily committed illegal acts in violation of the securities laws by acting on and failing to disclose inside information); *Kuehnert v. Texstar Corp.,* 412 F.2d 700 (5th Cir.1969) (doctrine of *in pari delicto* bars "tippee" suits against "tippers"). *But see Moholt v. Dean Witter Reynolds, Inc.,* 478 F.Supp. 451, 453 (D.D. C.1979) (*in pari delicto* inapplicable to section 10(b) securities fraud claim where broker purports to furnish inside tips because broker could never be only equally at fault with receptive but duped investors); *Nathanson v. Weis, Voisin, Cannon, Inc.,* 325 F.Supp. 50 (S.D.N.Y.1971); *see also Xaphes v. Shearson, Hayden, Stone, Inc.,* 508 F.Supp. 882, 886 (S.D.Fla.1981) (defense does not apply to Rule 10b–5 claim

where a non-insider broker misrepresents that he is an insider to a customer because customer is not a "tippee" with a duty to disclose). *Cf. Berner v. Lazzaro,* 730 F.2d 1319 (9th Cir.1984) (defense of *in pari delicto* applies only where the parties are equally at fault). If we were to conclude that the *in pari delicto* defense is inappropriate here, further fact finding would be necessary to decide the merits of this claim.

We need not, however, reach that important issue because of our holding with respect to the pendent state law claim of negligent misrepresentation.

### III. CLAIMS BASED ON FAILURE TO INFORM CONCERNING RECENT MARKET PRICE

As already related, it is undisputed that Curry failed to tell Zurad of the recent Heller price per share of $17 just before the merger publicity, its rapid rise to $30, apparently because of the publicity, and that trading had been suspended while the rise was occurring.

These omissions were the basis of a Rule 10b–5 claim and a pendent state law negligent misrepresentation claim.

■ The district court found with respect to these omissions that Zurad had not established either intent or reckless conduct. We are not persuaded that the finding was clearly erroneous, and it disposed of the 10b–5 claim. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

We conclude, however, that plaintiff sustained her state law negligent misrepresentation claim.

■ Under Illinois law, to sustain a claim for negligent misrepresentation, the plaintiff must establish a duty owed by defendant to plaintiff, a breach of that duty, and injury proximately resulting from the breach. *Lyons v. Christ Episcopal Church,* 71 Ill.App.3d 257, 27 Ill.Dec. 559, 389 N.E.2d 623 (5th Dist.1979). The

RESTATEMENT (SECOND) OF TORTS defines negligent misrepresentation as follows:

> Information Negligently Supplied for the Guidance of Others
>
> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552 (1965), *cited with approval in Citizens Savings and Loan Association v. Fischer,* 67 Ill.App.2d 315, 325, 214 N.E.2d 612, 617 (5th Dist.1966). Therefore, to recover on a theory of negligent misrepresentation Zurad had to demonstrate a breach of Curry's duty to exercise reasonable care or competence in obtaining or communicating information intended to guide her in her investment decisions.

■ The district court found that Zurad was not entitled to prevail on her claim of negligent misrepresentation because Curry—by advising Zurad against investing all her assets in Heller[1] and indicating that the merger might not necessarily occur—exercised reasonable care in supplying information to Zurad. We are left, however, with the firm conclusion that the finding was clearly erroneous.

The district court did not discuss at this point the significance of the information Curry omitted concerning the recent market price, the quick rise due to merger speculation, and that trading had been twice suspended. We are satisfied that the failure to supply that highly significant information while advising Zurad to purchase the stock was a breach of Curry's duty to exercise reasonable care in obtaining and relaying information to guide Zurad in her investment decisions. The omission of this information, coupled with the information Curry did give Zurad, amounted to a misrepresentation of the material facts relating to the degree of speculation involved in the purchase of the Heller stock. Merely advising Zurad against investing all her funds in Heller,[2] without more, did not fulfill his duty.

We know by hindsight that when the merger (at $42.50 according to reports) was abandoned, the price per share fell from approximately $30 to approximately $18. Of course no one could predict in July what would happen to the price if the merger plan were dropped, and it was Curry's opinion that the stock had been undervalued and was really worth the proposed merger price. But if defendants are to rely on plaintiff's awareness of the risk that the merger would not materialize, they cannot, it seems to us, escape responsibility for failing to inform Zurad of the market price of Heller just prior to rumors of the merger. Because that price might again be the market's judgment of worth in the absence of the rumored merger, that information would be most important in evaluating the risk. Even at 2,000 shares, Curry was advising plaintiff to invest almost 60% of her assets (there was a loan against the Abbott shares of about 30% of their value). Considering the difference in their positions and familiarity with the market, we cannot escape the conclusion that it was Curry's duty to give her this information. She was entitled to consider that fact in evaluating the risk undertaken, whether she decided only to follow his recommendation of 2,000 shares or to buy as much as she did. Although Curry was found not responsible for her decision to buy 5,000 shares, her decision to do so emphasized her need for full information. Curry's Office Manager admitted at trial that the purchase of 5,000 shares was not suitable for a person of Zurad's income and net worth.

Nothing in the facts suggests that Zurad should have known about or investigated any recent price inflation or suspension of

---

1. On petition for rehearing it has been called to our attention that there was no testimony that Curry advised against the purchase of 5,000 shares. The district court's reference to such ad-

vice doubtless refers only to the fact that Curry's recommendation was for a 2,000 share purchase.

2. See footnote 1, *supra.*

trading of the Heller stock. In fact, Curry's assurances that the stock was a sound investment could have caused an investor to refrain from such inquiry. "In the absence of circumstances putting a reasonable person on inquiry, a person is justified in relying on a misrepresentation of a material fact without making further inquiry." *Citizens Savings and Loan Association v. Fischer*, 214 N.E.2d at 616.

Accordingly, we reverse the judgment and remand for entry of judgment for Zurad on the negligent misrepresentation claim. The damages have been established at $75,891.49. We leave to the district court consideration of Zurad's claims to interest and attorney's fees. Circuit Rule 18 will not apply on remand.