Martin A. **RANKOW**, et al., Plaintiffs–Appellants,

v.

**FIRST CHICAGO CORP.**, Defendant–Appellee.

No. 88–1405.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1988.
Decided Feb. 24, 1989.

Michael J. Daley, Nisen & Elliott, Chicago, Ill., for plaintiffs-appellants.

Lynn A. Goldstein, Law Dept. of First Nat'l Bank, Chicago, Ill., for defendant-appellee.

Before CUDAHY, RIPPLE and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

The plaintiffs, participants in a Dividend Reinvestment and Stock Purchase Plan (the "Plan") provided by First Chicago Corporation ("First Chicago"), appeal the dismissal of the three counts of their complaint alleging breach of contract, negligent misrepresentation and violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and of Securities and Exchange Commission ("SEC") Rule 10b-5 (17 C.F.R. § 240.10b-5). They do not appeal the dismissal of their fourth count, a claim under § 18(a) of the Securities Exchange Act of 1934, alleging loss as a result of reliance on a false or misleading document filed with the SEC. We reverse and remand.

## I.

Plaintiff Rankow began his participation in the Plan in April of 1983; by December of 1985 all of the plaintiffs had become participants. The Plan permitted First Chicago's common stockholders to reinvest their dividends and to make optional cash payments toward the purchase of more shares of common stock at five percent under the prevailing market price, without paying service charges or brokerage commissions. Since this is an appeal from the dismissal of a complaint,[1] we accept as true the plaintiffs' allegation that their primary purpose in participating in the Plan was to sell immediately the shares they obtained in this way—and that First Chicago, the defendant, was fully aware of their practice. The amount of profit the plaintiffs made by reselling the shares they had obtained at discount prices obviously depended heavily on the timing of the purchase and resale. It was, therefore, crucial to their plan that they have reliable information as to which day would be the "pricing day" upon which discounts could be calculated.

The rules governing determination of pricing days were set out in the applicable Plan prospectus. When the plaintiffs first joined, the Plan was governed by a prospectus issued on May 10, 1982. The 1982 Prospectus provided that shares purchased pursuant to the Plan would be priced at 95% of the average high and low sales prices of the common stock as reported in the Wall Street Journal "on the first trading day of January, April, July and October of each year (the 'Pricing Date')." Complaint at ¶ 60.[2] This rule was changed in a new prospectus issued in December 1984. Under the 1984 Prospectus, shares would be priced at 95% of their average high and low sales price as reported in the Wall Street Journal on the dividend payment date. If common stock was not traded on the dividend payment date, then the pricing day would be the last preceding date on which the common stock had been traded.

---

1. A district court may dismiss a complaint for failure to state a claim only if the plaintiff cannot prove any set of facts upon which relief may be granted. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *First Interstate Bank of Nevada v. Chapman & Cutler*, 837 F.2d 775 (7th Cir.1988). We assume the truth of all well-pleaded allegations.

2. Thus, under the 1982 Prospectus, pricing dates could *only* fall on trading days, and there would have been no need to establish a policy for pricing dates that fell on days when stock was not traded. There is some confusion on this point in the briefs, see Appellants' Brief at 3, but the complaint itself states that the 1982 Prospectus used a "first trading day" policy. Complaint at ¶ 60. When *applied* to the facts involved in the transaction in dispute here, the 1982 policy generated a pricing date that was the day after rather than before the declared dividend date. *Id.* at ¶ 68.

The 1984 Prospectus contained a provision stating that

NO PERSON IS AUTHORIZED BY FIRST CHICAGO CORPORATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS, OTHER THAN THOSE CONTAINED IN THIS PROSPECTUS, IN CONNECTION WITH THE OFFER CONTAINED IN THIS PROSPECTUS.

Appellee's App. at 3. The prospectus also included a somewhat ambiguous discussion of provisions for modification of the plan, in a "question and answer statement of the provisions of the Plan:"

34. *May the Plan be changed or discontinued?* While the Company hopes to continue the Plan indefinitely, the Company reserves the right to suspend, terminate or modify the Plan at any time. You will be notified of any such suspension, termination or modification.

*Id.* at 13. As an answer to the final question in this section—"How may stockholders obtain answers to other questions regarding the Plan?"—the prospectus provided the address and telephone number of the Office of the Treasurer at First Chicago.

Soon after the new prospectus became effective, First Chicago declared a dividend payment date of January 1, 1985. Because no sales were conducted on that date, First Chicago could not use it as the pricing day. But instead of using a *preceding* trading day, as provided in the then-governing prospectus, First Chicago used the *following* day—January 2, 1985—as the pricing date. There apparently was no communication between First Chicago and the plaintiffs about this variance from the controlling prospectus at this time or throughout most of 1985.

In December of 1985, plaintiff Martin Rankow called on behalf of all of the plaintiffs to ask Richard Weincek, Senior Vice President of First Chicago, which date would be used as the pricing day for any purchases made on January 1 of 1986. Weincek, who at the time was in charge of administering the Plan for First Chicago, told Rankow that January 2 would once

again be used as the pricing date. In reliance on this statement, the plaintiffs made an optional cash investment of over $11 million and immediately arranged to sell on January 2 the stock they obtained through this investment. However, First Chicago on this occasion followed the 1984 Prospectus, and used December 31 rather than January 2 as the pricing date. Because the price of the stock was lower on January 2 than it had been on December 31, the plaintiffs sold more shares of stock than they had obtained and they had to buy additional stock on the open market in order to cover their sales. In the present action they seek to recover claimed losses on this transaction in the amount of $279,453.84.

Their original complaint was in four counts: breach of contract (I), negligent misrepresentation (II), violations of SEC Rule 10b–5 and of Section 10(b) of the Securities Exchange Act (III) and violation of Section 18(a) of the Securities Exchange Act (IV). The district court granted First Chicago's motion to dismiss on all four counts. Only the first three counts are raised on appeal.

## II.

### A.

■ The plaintiffs' breach of contract count is premised on the theory that Weincek, in representing January 2 as the pricing date, offered to modify the existing contract (embodied in the 1984 Prospectus) between First Chicago and the plaintiffs. When the plaintiffs sent in their payment, under this theory, they accepted Weincek's offer. First Chicago, however, denies that Weincek had any authority to modify the terms of the Plan as given in the prospectus.

The district court, in holding for First Chicago, gave dispositive weight to the printed disclaimer. The court concluded that the mere existence of this provision definitively established (1) that Weincek lacked authority to modify the terms of the prospectus; (2) that the plaintiffs were on notice that Weincek lacked authority; and

(3) that plaintiffs' reliance on Weincek's representations was therefore unreasonable. *Rankow v. First Chicago Corp.*, 678 F.Supp. 202, 205 (N.D.Ill.1988). However, the court did not consider the way in which First Chicago's deviation from the terms of the 1984 Prospectus might affect the "authority" problem. Because a determination of the agent's authority in this case requires an examination of the surrounding circumstances and because issues of fact may be involved in this determination,[3] we must reverse and remand on the breach of contract count.

Under Illinois law, "the existence and scope of an agency relationship are questions of fact, to be decided by the trier of fact," unless the relationship is "so clear as to be undisputed." *St. Ann's Home for the Aged v. Daniels*, 95 Ill.App.3d 576, 579, 51 Ill.Dec. 64, 67, 420 N.E.2d 478, 481 (1st Dist.1981); *see also Giannini v. First Nat'l Bank of Des Plaines*, 136 Ill.App.3d 971, 91 Ill.Dec. 438, 483 N.E.2d 924 (1st Dist.1985); *Sherman v. Field Clinic*, 74 Ill.App.3d 21, 29 Ill.Dec. 597, 392 N.E.2d 154 (1st Dist.1979). In determining the existence and scope of an agency relationship the fact finder must examine "the facts and circumstances surrounding the particular case," *Giannini*, 136 Ill.App.3d at 986, 91 Ill.Dec. at 451, 483 N.E.2d at 937, and "reference may be made to the situation of the parties, their acts, and other relevant circumstances." *St. Ann's*, 95 Ill. App.3d at 579, 51 Ill.Dec. at 67, 420 N.E.2d at 481; *see also Kalman v. Bertacchi*, 57 Ill.App.3d 542, 15 Ill.Dec. 204, 373 N.E.2d 550 (1st Dist.1978); *Elmore v. Blume*, 31 Ill.App.3d 643, 334 N.E.2d 431 (3d Dist. 1975). Similarly, "[w]hether a person has

notice of the lack of an agent's authority or is put on notice by circumstances is a question of fact." *Schoenberger v. Chicago Transit Auth.*, 84 Ill.App.3d 1132, 39 Ill. Dec. 941, 405 N.E.2d 1076 (1st Dist.1980); *see also Paine v. Sheridan Trust & Sav. Bank*, 342 Ill. 342, 174 N.E. 368 (1930); *Slape v. Fortner*, 3 Ill.App.2d 339, 122 N.E.2d 57 (4th Dist.1954).

Illinois law, then, does not appear to dictate as narrow an analysis of Weincek's authority as the district court undertook here. The court relied primarily on *Malcak v. Westchester Park District*, 754 F.2d 239 (7th Cir.1985), in which a former Superintendent of Parks and Recreation sued the Westchester Park District for depriving him of his job without due process in violation of the Fourteenth Amendment. Malcak claimed that a number of individual commissioners had verbally assured him that his job would be continued as long as his work was adequate. He argued that these verbal assurances had varied the terms of his employment contract as prescribed in the Park District's Operating Manual (the "Manual"). The Manual not only provided for at-will employment, terminable upon sixty days' notice by either party, but also clearly stated that no individual board member had the legal or moral right to speak for the board "unless specifically authorized to do so by action of the Board." *Id.* at 245.

This case, then, resembles *Malcak* in one aspect: both cases involve governing contractual documents with specific limitations on the authority of the agents in question. However, in *Malcak* there was no conduct alleged that would call the limitation into question.[4] By contrast, the plaintiffs here

---

**3.** That this inquiry is a factual one, requiring a thorough examination of the circumstances in this case, does not necessarily mean that it must be performed by a jury, but rather that it requires a more thorough examination of the facts than can be performed on the pleadings alone.

**4.** The plaintiff in *Malcak* did allege that the Board, in automatically including his salary in the annual budget while he was employed, had by its course of conduct created a contract for continuing employment. *Malcak*, 745 F.2d at 244. However the alleged course of conduct in that case did not violate the terms of the exist-

ing contract; nothing in the Manual provided that Malcak's salary should be excluded from automatic inclusion in the annual budget. By contrast, this case involves conduct directly violating express terms of the contract in question. This action in violation of the contract may cast doubt on the force of the contractual provisions and also raises questions about the source of the authority for varying the pricing date provision spelled out in the prospectus. If, as in *Malcak*, the plaintiffs here had relied only upon a purported agent's verbal assurances when the governing contract told them not to, they would have a very questionable case. But by virtue of

allege conduct violating the controlling prospectus provisions. Although the limitation of authority in the prospectus is highly significant (a prominent disclaimer in a formal governing document), an express limitation of authority may sometimes be overcome by a showing of "actions sufficiently inconsistent with that limitation to raise a fact issue" regarding the agent's authority to bind the principal. *Goldstick v. Kusmiersky,* 593 F.Supp. 639, 646 (N.D.Ill.1984). Because this case is still at the pleading stage, the record is silent as to the details of Weincek's authority, his relationship with First Chicago and the history of his interactions with the plaintiffs. Under the standard of *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the plaintiffs have alleged sufficient facts to raise a question whether the defendant's actions varied the terms of the written contract—including the term limiting Weincek's (and other potential agents') authority.[5] We will therefore remand the contract count to determine whether under Illinois law the surrounding circumstances form a basis for looking beyond the limitation of authority stated in the prospectus or for clothing Weincek with apparent authority. One of the questions is whether the pricing action of First Chicago in January 1985, which was apparently inconsistent with the prospectus, could, in connection with subsequent events, vitiate the written limitation of authority and result in some actual or apparent authority in Weincek.[6] These questions are not appropriately disposed of on the pleadings.

### B.

The plaintiffs' second count alleges negligent misrepresentation. The district court dismissed this count because Illinois law only allows recovery for purely economic losses under a negligent misrepresentation theory when the defendant is "in the business of supplying information for the guidance of others in their business transactions." *Rankow,* 678 F.Supp. at 205 (quoting *Black, Jackson and Simmons Ins. Brokerage, Inc. v. IBM Corp.,* 109 Ill.App. 3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282 (1st Dist.1982)). The court did not feel that First Chicago met this requirement.

The district court apparently viewed *National Union Fire Insurance Co. of Pittsburgh v. Continental Illinois Corp.,* 654 F.Supp. 316 (N.D.Ill.1987), as dispositive of the issue whether a bank could ever be "in the business of supplying information." This reading was overbroad. The *National Union* case involved insurance companies that were attempting to rely on a negligent misrepresentation theory in a counterclaim against certain defendant insureds, a bank holding company and its officials. The information at issue in that case was given by the insured bank to the insurance companies as part of its applica-

their allegations regarding First Chicago's apparent violation of the governing prospectus provisions, the plaintiffs have a different case, one requiring a broader examination of surrounding circumstances than was indicated in *Malcak.*

**5.** It is precisely because the pleadings apparently raise material issues of fact that the rule announced in *Malcak* ("Under Illinois law, if there is no dispute over the relevant facts, the question of the existence of a contract is solely a matter of law for determination by the courts," 754 F.2d at 243) is not controlling here. This case more closely resembles *Vail v. Board of Educ. of Paris Union School Dist. No. 95,* 706 F.2d 1435 (7th Cir.1983), where the court focused its inquiry on the facts and circumstances surrounding the alleged contract, following the guidelines prescribed by Illinois law to determine whether there was an implied contract. In *Vail,* as in this case, there were factual possi-

bilities raised by the plaintiff's allegations which, if true, could arguably have demonstrated that surrounding circumstances had altered the provisions of a written contract. This fact-based approach accords with business practice, which can play a role in varying the terms of ongoing contractual relations. *See* Macaulay, *Non–Contractual Relations in Business: A Preliminary Study,* 20 Am.Soc.Rev. 55 (1963).

**6.** For discussions of apparent authority, *see Schoenberger,* 84 Ill.App.3d at 1137, 39 Ill.Dec. at 946, 405 N.E.2d at 1081; *Wing v. Lederer,* 77 Ill.App.2d 413, 417, 222 N.E.2d 535, 538 (2d Dist.1966). Our discussion of guidelines from Illinois law governing the analysis of agents' authority applies whether the authority is actual or apparent, express or implied. *See Giannini,* 136 Ill.App.3d at 986–87, 91 Ill.Dec. at 451, 483 N.E.2d at 937; *Schoenberger,* 84 Ill.App.3d at 1137, 39 Ill.Dec. at 946, 405 N.E.2d at 1081.

tion for insurance policies. Given the isolated nature of the transaction, it is apparent that the bank holding company was not in the business of supplying information to insurance companies in order to secure insurance policies. Further, the information was not used to guide the insurance companies in conducting business with third parties. Rather, the information merely facilitated business between the two parties exchanging information, thereby aiding in the formation of a contract between them. As the court in *National Union* indicated, the exchange of this sort of information does not meet the "business of supplying information" test as spelled out in Illinois cases such as *Black, Jackson and Simmons. National Union*, 654 F.Supp. at 317–18; *see also National Can Corp. v. Whittaker Corp.*, 505 F.Supp. 147 (N.D.Ill.1981). However, the facts in *National Union* do not reach the question raised by the circumstances of this case, in which a different sort of information was supplied.

A precise, case-specific inquiry is required to determine whether a particular enterprise is "in the business of supplying information for the guidance of others in their business transactions." This is the only way to reconcile *National Union* with cases like *Guaranty Bank and Trust Co. v. Reyna*, 51 Ill.App.2d 412, 201 N.E.2d 144 (1st Dist.1964), holding that a bank met the "business of supplying information" test, and *Citizens Savings and Loan Ass'n v. Fischer*, 67 Ill.App.2d 315, 214 N.E.2d 612 (5th Dist.1966), which also held a bank liable under a negligent misrepresentation theory. Whether a bank can be held liable for negligent misrepresentation depends upon the nature of the information at issue

in a particular case and its relation to the kind of business being conducted.

In making such a determination in the case before us, we look to the Illinois guidelines, as provided by the state courts and as indicated by the federal district courts in Illinois. *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969), is commonly identified as the seminal Illinois Supreme Court case establishing the tort of negligent misrepresentation in Illinois. Although *Rozny* did not address the "business of supplying information" requirement specifically,[7] the Illinois Supreme Court in *Rozny* did approve the reasoning found in the Restatement (Second) of Torts, section 552 (then in draft form), which provided the basis of the "business of providing information" requirement.

Even before *Rozny*, the Illinois appellate courts, as noted, had begun to define the scope of this requirement. In *Guaranty Bank*, a bank responded to an inquiry from the plaintiff whether the individual with whom she had negotiated a lease was in fact the bank's agent. 51 Ill.App.2d at 419, 201 N.E.2d at 148. A letter from the bank stated that the person in question was not empowered to act as its agent. Relying on this letter, the plaintiff repudiated her lease. However, the person with whom she had negotiated the lease was in fact a duly authorized agent of the bank. The court in *Guaranty Bank* held that the information in the bank's letter was (1) "supplied by the bank ... in the course of its business in response to an inquiry" and (2) "supplied to guide Miss Reyna in the conduct of a serious business matter." *Id.* at 422, 201 N.E.2d at 150. Both *Guaranty Bank* and a subsequent case, *Citizens Sav-*

---

7. *Rozny* was primarily concerned with the possible ramifications of creating a potentially unlimited class of defendants. The case attempted to limit the class of possible claimants by requiring that they be not merely "forseeable" but actually "known" at the time of the tort, and by limiting its holding to cases in which the defendant had provided an "absolute guarantee" that the information provided would be accurate. 43 Ill.2d at 66–67, 250 N.E.2d at 662. The Illinois appellate courts have had some difficulty in dealing with this "guarantee of accuracy" provision. *See Perschall v. Raney*, 137 Ill.App. 3d 978, 92 Ill.Dec. 431, 484 N.E.2d 1286 (4th

Dist.1985); *Grass v. Homann*, 130 Ill.App.3d 874, 85 Ill.Dec. 751, 474 N.E.2d 711 (4th Dist. 1985); *Duhl v. Nash Realty, Inc.*, 102 Ill.App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267 (1st Dist. 1981); *McAfee v. Rockford Coca–Cola Bottling Co.*, 40 Ill.App.3d 521, 352 N.E.2d 50 (2d Dist. 1976). The court in *Perschall* finally concluded that "a guaranty of accuracy is not a requirement for the tort, but is a factor to be considered in determining whether a plaintiff's reliance is foreseeable and justifiable." 137 Ill. App.3d at 984, 92 Ill.Dec. at 435, 484 N.E.2d at 1290.

*ings,* 67 Ill.App.2d 315, 214 N.E.2d 612 (5th Dist.1966), made it clear that banks could be held liable for the negligent misrepresentations of their agents.

The Illinois Supreme Court subsequently reaffirmed this approach. However, it introduced stringent limitations on tort recoveries for misrepresentation generally, holding that there could be no recovery for solely economic loss unless the defendant either "intentionally makes false representations" or "is in the business of supplying information for the guidance of others in their business transactions [and] makes negligent misrepresentations." *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 88–89, 61 Ill.Dec. 746, 755, 435 N.E.2d 443, 452 (1982). Thus the "business of supplying information" exception has survived albeit in the context of a somewhat restated doctrine.[8]

■ A careful review of the cases squarely addressing the issue to date discloses an emerging consensus. The two critical defining features were enunciated by the court in *Black, Jackson and Simmons:* "First, the defendant must supply the information in the course of his business and second, the information must be supplied for the guidance of others in their business transactions." 109 Ill.App.3d at 135, 64 Ill.Dec. at 732, 440 N.E.2d at 284. The court added a clarification regarding the second requirement; the information

**8.** While the negligent misrepresentation exception (as we have discussed it) survived, the intervening change in the law represented by *Moorman* does make a difference in how pre-*Moorman* cases should be read. The plaintiffs cite *Lyons v. Christ Episcopal Church,* 71 Ill. App.3d 257, 27 Ill.Dec. 559, 389 N.E.2d 623 (5th Dist.1979), a case in which an Illinois appellate court allowed a negligent misrepresentation claim against a church. The plaintiffs' subsequent discussion proceeds under the assumption that the *Lyons* court through its holding determined that a church was "in the business of providing information." However, the court in *Lyons* never discussed the "business of providing information" requirement, presumably because before *Moorman* it was possible to allow recovery for negligent misrepresentation where strictly economic injury was alleged without meeting this requirement. Both *Lyons* and *Rotello v. Scott,* 95 Ill.App.3d 248, 50 Ill.Dec. 784, 419 N.E.2d 1233 (2d Dist.1981), which the plaintiffs also cite, are pre-*Moorman* cases in which the courts allowed recovery against sellers of property for negligent misrepresentations about the property.

Subsequent Illinois cases have applied *Moorman* to similar situations and have reached different results. Thus the court in *Zimmerman v. Northfield Real Estate, Inc.,* 156 Ill.App.3d 154, 109 Ill.Dec. 541, 510 N.E.2d 409 (1st Dist.1987) determined that while real estate *brokers* are in the business of supplying information that guides their clients in transactions with third parties (in that case, with the sellers), the sellers themselves "do not fall within the *Moorman* exception." *Id.* at 164, 109 Ill.Dec. at 547, 510 N.E.2d at 415. *Accord Richmond v. Blair,* 142 Ill.App.3d 251, 94 Ill.Dec. 564, 488 N.E.2d 563 (1st Dist.1985) (real estate broker meets "business of supplying information" test); *Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267 (1st Dist.1982) (real estate brokers in the course of their business supplied information to clients to guide them in business of buying and selling house). *But see Century Universal Enter., Inc. v. Triana Dev. Corp.,* 158 Ill.App.3d 182, 205, 110 Ill.Dec. 229, 243, 510 N.E.2d 1260, 1274 (2d Dist.1987) ("One may infer that the sellers were also in the business of providing information specifically about the condition of the real estate.") (dictum).

*Moorman's* progeny have followed a meandering path. *Compare Lehmann v. Arnold,* 137 Ill.App.3d 412, 420, 91 Ill.Dec. 914, 920, 484 N.E.2d 473, 479 (4th Dist.1985) (*Moorman* not controlling in negligent misrepresentation cases because it did not explicitly overrule *Rozny*) *with Century Universal,* 158 Ill.App.3d at 205, 110 Ill.Dec. at 243, 510 N.E.2d at 1274 (rejecting contention that *Moorman* is inapplicable in negligent misrepresentation case). However the bulk of the Illinois authority appears to support a broad application of *Moorman*—and this is indeed the approach required by *Moorman* itself, which quite clearly limits recovery to (1) intentional (fraudulent) misrepresentation and (2) negligent misrepresentation where the "business of supplying information" test is met. The *Zimmerman* holding is, furthermore, consistent with *Black, Jackson and Simmons,* in which the court reasoned that information provided by the sellers (of a computer and of software) to the buyer was not information used to guide the buyer in its business with third parties. 109 Ill.App.3d at 136, 64 Ill.Dec. at 732, 440 N.E.2d at 284. These subsequent cases cast serious doubt on the holding in *Lyons,* which cannot be read as a determination of any kind whether churches—or sellers—meet the "business of supplying information" test. Similarly, no case has as yet found lawyers liable for negligent misrepresentation under the "business of supplying information" test. *See Pelham v. Griesheimer,* 92 Ill.2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96 (1982); *J & G Restaurant v. Regas,* 156 Ill.App. 3d 834, 109 Ill.Dec. 17, 510 N.E.2d 17 (1st Dist. 1987).

supplied must be "for the guidance of others in their business relations with *third parties*." *Id.* (emphasis in original); *see also National Can*, 505 F.Supp. at 150 ("Th[e] tort has been recognized almost exclusively in situations where information was supplied that damaged a plaintiff in its relations with *third parties*.") (emphasis in original).

Application of the "third parties" requirement is fairly straightforward in the case before us. In the course of its business, First Chicago supplied the plaintiffs with two kinds of information, at least one of which guided them in their transactions with other business partners. First, the defendant gave the plaintiffs information about pricing dates, upon which they relied in their subsequent short sales in the market—dealings of which First Chicago was aware and which it surely contemplated in designing the Plan. Whether its contractual duty was based on a written prospectus, from which it deviated, or upon the oral representations of its purported agent is an issue we are remanding. *See supra* Section II. A. Second, the defendant disclosed information as required by the federal securities laws. Plaintiffs assert that this information, supplied by First Chicago, meets the "business of supplying information" test. But it is difficult to see in what way this kind of information guides purchasers of securities in their *other* business transactions; the primary purpose of these disclosures is to guide purchasers in making their decisions about buying the securities. This use of information is indistinguishable from that in *Black, Jackson and Simmons*, where information given by two sellers to guide the buyer in its purchase of the sellers' products was held not to satisfy the "guidance of others in their business transactions" test. 109 Ill.App.3d at 136, 64 Ill.Dec. at 732, 440 N.E.2d at 284. However, the plaintiffs appear to have made allegations under their first theory sufficient to state a claim that First Chicago supplied them with information that guided them in their business with third parties.

The more difficult question is whether the first and basic requirement enunciated in *Black, Jackson and Simmons* has been met—that is, whether First Chicago is "in the business" of supplying this information. Although the original language from the Restatement of Torts would have supported a broader treatment,[9] allowing recovery wherever information is provided "in the course of" business, recent decisions appear to approach this inquiry more narrowly. In *Tan v. Boyke*, 156 Ill.App.3d 49, 108 Ill.Dec. 229, 508 N.E.2d 390 (2d Dist.1987), for example, the court concluded summarily that "the defendant is clearly not in the business of supplying information to others," *id.* at 59, 108 Ill.Dec. at 235, 508 N.E.2d at 396, where the defendant was the builder, owner and manager of apartment buildings he had sold to the plaintiff. Although the defendant clearly provided the plaintiff with information "in the course of" the business they conducted, the court had no difficulty in concluding that he was not "in the business of supplying information." *Accord Knox College v. Celotex Corp.*, 117 Ill.App.3d 304, 308, 72 Ill.Dec. 703, 706, 453 N.E.2d 8, 11 (3d Dist. 1983) (manufacturer of roofing materials "is not engaged in the business of supplying information but is simply a manufacturer and seller of roofing materials").

There has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is "in the business of supplying information." However, such a principle is suggested by the outcomes of the cases. On the one hand, there are the cases in which the Illinois courts have decided that defendants were *not* in the business of supplying information, involving a developer, a builder/owner of an apartment building, a precipitator manufacturer, a manufacturer of roofing materials, a computer manufacturer and a computer software manufacturer. *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986); *Century Uni-*

---

**9.** The Restatement provision reads: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information...." Restatement (Second) of Torts § 552 (1977).

*versal Enter., Inc. v. Triana Dev. Corp.,* 158 Ill.App.3d 182, 110 Ill.Dec. 229, 510 N.E.2d 1260 (2d Dist.1987); *Tan v. Boyke,* 156 Ill.App.3d 49, 108 Ill.Dec. 229, 508 N.E. 2d 390 (2d Dist.1987); *Knox College v. Celotex Corp.,* 117 Ill.App.3d 304, 72 Ill. Dec. 703, 453 N.E.2d 8 (3d Dist.1983); *Black, Jackson and Simmons Ins. Brokerage, Inc. v. IBM Corp.,* 109 Ill.App.3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282 (1st Dist.1982). The district court cases for the most part follow a similar pattern, holding that manufacturers and sellers who deal only in tangible products are generally not "in the business of supplying information." *See Navistar Int'l Corp. v. Hagie Mfg. Co.,* 662 F.Supp. 1207 (N.D.Ill.1987) (sellers of crop sprayers); *National Can Corp. v. Whittaker Corp.,* 505 F.Supp. 147 (N.D.Ill. 1981) (compound manufacturer). Obviously, a great many businesses involve an exchange of information as well as of tangible products—manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, precipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.

On the other hand, there are the cases in which the Illinois courts have found that certain defendants were clearly in the business of supplying information. Following the early case putting banks in that category, *Guaranty Bank and Trust Co. v. Reyna,* 51 Ill.App.2d 412, 201 N.E.2d 144 (1st Dist.1964), subsequent cases have held that stockbrokers, real estate brokers and termite inspectors are in the business of supplying information. *Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Ill.App.3d 75, 24 Ill.Dec. 464, 385 N.E.2d 376 (3d Dist.1979); *Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267 (1st Dist.1981); *Richmond v.*

*Blair,* 142 Ill.App.3d 251, 94 Ill.Dec. 564, 488 N.E.2d 563 (1st Dist.1985); *Perschall v. Raney,* 137 Ill.App.3d 978, 92 Ill.Dec. 431, 484 N.E.2d 1286 (4th Dist.1985). Real estate brokers and termite inspectors would seem to fall fairly clearly into a category at the opposite end of a continuum beginning with manufacturers dealing only in tangible goods; brokers and inspectors arguably provide information *only*. If we ask what the product is in these cases, the answer is obviously "information," whether about the housing market or about termite infestations. Between these two extremes lie the more difficult cases, involving defendants whose business it is to provide both tangible goods (or other non-informational goods or services [10]) *and* information. Financial services such as those provided by banks and stockbrokers present a particularly difficult problem, because there is a very thin line between an exchange of information about finances and actual financial transactions. *See also Duchossois Indus. v. Stelloh,* No. 87 C 4132 (N.D.Ill. Jan. 13, 1988) [1988 WL 2794]. That is why, as noted at the outset, it is particularly important in these settings to examine the particular information and transactions involved case by case.

Although the district court has found that in one instance a bank was not "in the business of supplying information," *National Union,* 654 F.Supp. at 318, as our discussion above indicates, that case involved information that was clearly not central to the business of the bank. In the other cases involving banks, the courts have found that banks can be liable for negligent misrepresentation. *See Citizens Savings,* 67 Ill.App.2d at 324–25, 214 N.E.2d at 616–17; *Guaranty Bank,* 51 Ill. App.2d at 428, 201 N.E.2d at 149–50; *see also Instituto Nacional de Commercializacion Agricola v. Continental Illinois Bank and Trust Co.,* 530 F.Supp. 279, 284–

---

**10.** The issue is obviously whether or not the product is information, not whether or not it is tangible. We use businesses dealing in tangible goods as an example here for two reasons: first, they provide the clearest case of non-informational products (because the transfer of intangible products and services more often depends heavily upon an exchange of information); and second, they are the only examples we have from the Illinois courts of businesses that have been held *not* to be in the business of providing information.

85 (N.D.Ill.1982). As noted, *Guaranty Bank* is particularly in point here. In that case the incorrect information provided by a bank official in response to a query (regarding who was empowered to act as the bank's agent) was held to meet the "business of supplying information" test. Information provided to Plan participants regarding pricing dates is even more clearly part of the product provided by First Chicago than was the information provided in *Guaranty Bank* to an unrelated party.

Indeed, in other "mixed" cases, where both goods (or services) and information were exchanged, the courts have found that the test was met. *Duchossois,* perhaps the clearest example, involved a seller who prepared provenances for the paintings it sold. The court held that because these provenances were an important part of the product provided by the seller, and because they were provided in that case with full knowledge that the buyer would use them in future resale transactions, the "business of supplying information" test was met. *Duchossois Indus., v. Stelloh,* No. 87 C 4132 (N.D.Ill. Jan. 13, 1988) [1988 WL 2794]. Similarly, the information about pricing dates provided to the plaintiffs by First Chicago in this case was an important part of the product it offered—a financial service. Further, the information in this case, like that in *Duchossois,* was provided with full knowledge that it would be used in guiding the plaintiffs in their business transactions with third parties. Under this analysis, which is further supported by the holdings in *Citizens Savings* and *Guaranty Bank,* the district court was incorrect in concluding at this stage that plaintiffs failed to allege facts sufficient to meet the "business of supplying information" requirement.

The stockbroker cases afford further, if slightly weaker, parallels to this case. In *Penrod,* a customer of a brokerage firm sued to recover losses allegedly incurred after following negligently-given advice from a broker. While the court did not find that the broker in that case had breached his duty of care, it did hold that the broker and brokerage firm were in the business of supplying information, citing to the earlier Illinois bank cases to support its conclusion that the broker as agent and the firm as principal could have been held liable. 68 Ill.App.3d at 82, 24 Ill.Dec. at 469, 385 N.E.2d at 381. It is of particular interest that the brokerage firm in *Penrod* not only provided its customers with information, but also provided a service of holding securities for its customers, transferring the securities upon instructions from clients. *Id.* at 77, 24 Ill.Dec. at 466, 385 N.E.2d at 378. For the purposes of the "business of providing information" test, there is little difference between this combined exchange of financial services and information and that provided by First Chicago (except that securities may be more obviously the principal business of a stockbroker than of a bank).[11]

*Zurad v. Lehman Bros. Kuhn Loeb,* 757 F.2d 129 (7th Cir.1985), is another case involving a business that furnished both information and financial services. *Zurad,* also a stockbroker case, was recently before this court.[12] We decided there that the defendant brokerage firm, which not only provided the plaintiff with information but also handled her money through a cash account with the firm, could be held liable under the "business of supplying information" test. *Id.* at 133–34. Although the balance of information in relation to non-informational financial services supplied by First Chicago here is arguably somewhat different from that found in the stockbroker cases and although the information in this case was provided by First Chicago to its stockholders rather than its customers, these differences are not sufficiently decisive to relieve First Chicago of liability.

■ First Chicago urges that even if it is in the business of supplying information, it

---

**11.** Although it could be argued that a dividend reinvestment plan is not as central to the bank's business as other financial dealings, the caselaw from Illinois courts has not provided any indication that such a distinction should be decisive.

**12.** This Seventh Circuit case, directly on point, was cited by neither party in the case before us.

is not liable because it did not owe plaintiffs a duty. Appellee's Brief at 15. However, its arguments in support of this contention all go to the issue of breach of duty, which is a question of fact not suitable for disposition at this stage. *Ferentchak v. Village of Frankfort*, 105 Ill.2d 474, 480, 86 Ill.Dec. 443, 446, 475 N.E.2d 822, 825 (1985). Although First Chicago correctly concludes that the *existence* of a duty is an issue of law, *Cunis v. Brennan*, 56 Ill.2d 372, 374, 308 N.E.2d 617, 618 (1974); *Holubek v. City of Chicago*, 146 Ill.App.3d 815, 100 Ill.Dec. 370, 372, 497 N.E.2d 348, 350 (1st Dist.1986), there is no real issue regarding the existence of a duty in this case. First Chicago owed a clear duty by virtue of its contractual relationship with the plaintiffs; there is no question involving third parties or extra-contractual dealings of the kind found in the Illinois cases in which existence of a duty has been deemed problematic.[13] *See Curtis v. County of Cook*, 98 Ill.2d 158, 74 Ill.Dec. 614, 456 N.E.2d 116 (1983) (local government owes duty only to people intended and permitted to use government property); *Pelham v. Griesheimer*, 92 Ill. 2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96 (1982) (attorney owes no duty to children of client); *Popp v. Dyslin*, 149 Ill.App.3d 956, 102 Ill.Dec. 938, 500 N.E.2d 1039 (2d Dist. 1986) (bank owes no duty to third-party creditor); *Brumley v. Touche, Ross & Co.*, 123 Ill.App.3d 636, 79 Ill.Dec. 57, 463 N.E. 2d 195 (2d Dist.1984) (accounting firm owes no duty to investor buying shares in corporation for which firm prepared audit report).

We conclude that, at least as a matter of pleading, this case involves a defendant part of whose business seems to be to provide both information and financial services to its stockholders, to whom it owes a duty. The plaintiff has therefore made a

sufficient allegation to state a claim under a negligent misrepresentation theory.

## C.

■ Finally, the district court dismissed the plaintiffs' third count alleging violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and of SEC Rule 10b–5 (17 C.F.R. § 240.10b–5). In reviewing this claim, we keep in mind that plaintiffs are not required to prove that they can win on the pleadings, but only that their allegations are sufficient under *Conley v. Gibson*. Plaintiffs have met this very preliminary test.

The district court held that plaintiffs failed to make a prima facie case under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 on two key issues: first, plaintiffs failed to plead conduct on the part of the defendants sufficiently reckless to meet the Rule 10b–5 scienter requirement; and second, plaintiffs did not sufficiently allege "loss causation."

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that, in the absence of scienter, a private action for damages under Section 10(b) and Rule 10b–5 would not lie. This court subsequently ruled that reckless conduct could satisfy the *Hochfelder* scienter requirement. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.1977) (reckless omission of material facts upon which plaintiff justifiably relies in connection with sale or purchase of securities actionable under section 10(b) and Rule 10b–5). The district court concluded in summary fashion that "because there is no evidence that First Chicago knew about or approved of Weincek's statement, First Chicago's conduct was not such that it actually knew or must have been aware of

---

**13.** It is true that if the duty asserted fell outside of the bounds of the existing contract, plaintiffs would not have met their burden. *See Ferentchak v. Village of Frankfort*, 105 Ill.2d 474, 86 Ill.Dec. 443, 475 N.E.2d 822 (1985) (contractual agreement did not require defendant to set foundation grade levels); *Holubek v. City of Chicago*, 146 Ill.App.3d 815, 100 Ill.Dec. 370, 497

N.E.2d 348 (1st Dist.1986) (contractual agreement did not require contractor to maintain property in question). However, in this case, plaintiffs allege a contractual duty to use due care in providing accurate information about the Plan and its pricing dates, and that seems to fall squarely within the bounds of the existing contract.

the danger that the investors would be deceived." *Rankow v. First Chicago Corp.*, 678 F.Supp. 202, 207 (N.D.Ill.1988). But the plaintiffs' allegations do raise a colorable issue of fact on the issue of knowledge; it is not appropriate at this stage to determine whether the evidence supports the allegation of First Chicago's knowledge. Thus the district court assumed away a key, apparently disputed, issue of fact. This was incorrect on a motion to dismiss.

In *Sundstrand* we adopted the following definition of recklessness:

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Sundstrand*, 553 F.2d at 1045 (quoting *Franke v. Midwestern Oklahoma Dev. Auth.*, 428 F.Supp. 719 (W.D.Okl.1976)). The plaintiffs have alleged, and it does not seem to be disputed, that First Chicago departed from the stated terms of a governing prospectus. The plaintiffs have further alleged that First Chicago knew of their pattern of short sales. If First Chicago knowingly departed from its prospectus, and then failed to formally clarify the situation so that participants would know whether to rely on the terms of that prospectus—and if it did so with a full awareness of plaintiffs' need for reliable information on pricing dates—then it is not immediately apparent that First Chicago's conduct was not reckless. To be sure, "the definition of 'reckless behavior' should not be a liberal one," and mere negligence will not suffice to meet the test. *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977); *see also Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir.1981). But to determine whether the conduct involved in this case is reckless or negligent requires a more detailed inquiry into the facts, one which is not appropriate—or, indeed, possible—on the complaint alone.

Finally, the district court also concluded that plaintiffs had failed to plead loss causation. This court has recently visited the question of loss causation, and defined it as follows: " 'Loss causation' means that the investor would not have suffered a loss if the facts were what he believed them to be." *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928 (7th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988). First Chicago implicitly acknowledges the difficulty it faces in meeting this test, for it urges us to overrule *LHLC* or limit it to its facts. But, as this court observed in *LHLC*, the terms "loss causation" and "transaction causation," "ungainly to start with because they conscript nouns for service as adjectives, have been confusing in practice because they do not link the definition of 'causation' to any theory about why people might be liable under the securities laws." *Id.* at 931. The theory of loss causation advanced by First Chicago and accepted by the district court is a good example of this confusion. Under the district court's theory, any intervening change in market conditions not directly caused by the defendant could break the chain of causation and exempt the defendant from liability, a result that would eviscerate Rule 10b–5. The definition of loss causation adopted in *Kademian v. Ladish*, 792 F.2d 614, 628 n. 11 (7th Cir. 1986), from *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374 (2d Cir.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), allowed a loss to be "demonstrated rather easily by proof of some form of economic damage." *Id.* at 380. This court's opinion in *LHLC* clarified what sort of proof would suffice. Plaintiffs have made adequate allegations under the *LHLC* test.

### III.

This is perhaps an apt case in which to recall the lesson of *Conley v. Gibson*: "[T]he Federal Rules of Procedure do not require a claimant to set out in detail the facts on which he bases his claim." 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Nor do they require a claimant to demonstrate that proof based on the plead-

ings will prevail. The plaintiffs in this case have alleged sufficient facts to raise valid claims for breach of contract, negligent misrepresentation and Rule 10b–5 and section 10(b) violations. The decision of the district court is

REVERSED AND REMANDED.