Guaranty Bank and Trust Company, an Illinois Banking Association, Formerly Known as Southmoor Bank and Trust Company, as Trustee Under Trust No. 8433, Plaintiff-Appellee, v. Tomasita Reyna, Defendant-Appellant and Cross Appellant.

Tomasita Reyna, Defendant Counter-Plaintiff Appellee and Appellant and Cross Appellant, v. Guaranty Bank and Trust Company, an Illinois Banking Association, Counter Defendant Appellant, and Leonard H. Lawrence, Counter Defendant Appellee.

Gen. No. 48,896.

First District, Second Division.

August 21, 1964.

Arvey, Hodes & Mantynband, of Chicago (Louis M. Mantynband, J. Herzl Segal, and Ralph A. Mantynband, of counsel), for Guaranty Bank and Trust Company, counterdefendant appellant.

Brown, Dashow & Langeluttig, of Chicago (Jack Joseph and Norman H. Arons, of counsel), for Tomasita Reyna, defendant counterplaintiff appellee and cross appellant and defendant and cross appellant.

Lawrence and Lawrence, of Chicago (Leonard H. Lawrence, of counsel), for Guaranty Bank and Trust Company, as trustee, plaintiff-appellee, and Leonard H. Lawrence, counterdefendant-appellee.

MR. JUSTICE BRYANT delivered the opinion of the court:

This is an appeal from an order of the Superior Court of Cook County entered on March 27, 1962, assessing damages of $30,676.69 in favor of plaintiff, Guaranty Bank and Trust Co., as Trustee under Trust No. 8433, and against defendant, Tomasita Reyna; assessing damages of $29,026.60 in favor of counterplaintiff, Tomasita Reyna, and against cross-defendant, Guaranty Bank and Trust Co., individually; and finding not guilty the cross-defendant Leonard H. Lawrence on Tomasita Reyna's counterclaim.

The facts of the case are as follows. Tomasita Reyna answered a "Business Opportunities" advertisement in a Chicago paper about November 27, 1960. The ad had been placed by Leonard Lawrence, advertising space for rent in a building at 1038 North Dearborn, Chicago. Miss Reyna met with Lawrence, examined the premises and discussed the possibility of opening a restaurant there. She had been in the restaurant business for ten years and was presently operating the Mexico Lindo Restaurant on North Clark Street. She was looking for a larger area in which to open a Mexican restaurant in a better neighborhood. Lawrence believed that a continental restaurant would be more successful at this location and proposed that Curtis Clark, a Chef, be brought in to take care of the continental end of it.

During December, 1960, Miss Reyna had meetings with Lawrence, representatives of Vision Associates, architects, and her attorney in respect to the property. Vision Associates was retained to draw preliminary plans for the restaurant and was given $500 by Mr.

414

Lawrence. Vision Associates was suggested by Lawrence as architects for the job. They were advised about the amount of capital available and proceeded to work on plans before the lease was entered into. Miss Reyna and Lawrence spoke of forming a corporation to run the restaurant with Miss Reyna, Lawrence and Curtis Clark as principals. Mr. Lawrence agreed to contribute 25% of the capital to the corporation. Miss Reyna was going to contribute 75%. Miss Reyna and Mr. Lawrence envisioned a total capitalization of around $25,000. The lease was to be entered into by Miss Reyna and later assigned to the corporation. The corporation was never formed.

The lease was drawn up by Leonard Lawrence and Miss Reyna's attorney on a printed form with rider attached. It was signed about January 14. On the face of the lease Southmoor Bank & Trust Company, as trustee under Trust No. 8433, appeared as lessor. Tomasita Reyna appeared as lessee. The lease was signed by Leonard H. Lawrence as agent of the Southmoor Bank & Trust Company.

The lease contained minimum rent provisions plus a percentage clause. No rent was to be paid under a deferred rental provision until May 1, 1961, the anticipated opening of the restaurant. A rider was attached to the form providing inter alia:

"(1) Lessor shall provide the same amount of heat for the comfort of the apartment residents of the Lansing Apartment Hotel, and until 10:30 o'clock p. m. during normal heating season.

"(12) Lessor agrees to permit Lessee to assign and transfer this lease to a corporation to be organized under the laws of Illinois by the Lessee. Lessor shall have the right to approve and consent to such assignment but will not unreasonably withhold consent. Lessee will not be liable to the provisions of this lease after assignment. Fur-

415

ther if assignee corporation assumes and legally accepts liability for the Lessee for the term prior to the assignment to assignee corporation and from the inception of this lease, Lessor shall release Lessee from any liability to it during said aforesaid period. . . .

"(14) It is expressly understood and agreed that Lessee shall make substantial alterations and improvements in the leased premises. Whereas Lessee has engaged Vision Associates, architects, to prepare plans and specifications for such alterations and improvements and to direct and supervise the same, Lessor hereby agrees to accept all plans and specifications for such alterations and improvements of said premises finally submitted by Vision Associates and accepted by Lessee, provided they do not conflict with or violate any ordinances of the City of Chicago and have been duly approved by the Building Department of the City of Chicago. The cost of all said alterations and improvements shall be borne by and paid for by Lessee. *However, the Lessor agrees to make the following alterations and improvements to the outside of the building premises, pursuant to plans and specifications prepared by Vision Associates, architects, at its own expense:*

"(1) remove all north and south walls separating the respective store premises in leased premises and replaster where necessary including rerouting and removal of all electric wiring and equipment; and all plumbing and heating equipment, in the walls;

"(2) provide and install sections on the outside of the building at various entrances and on Dearborn St. front as designed by said architects."

The rider was again signed Southmoor Bank & Trust Company, as Trustee, by Leonard H. Lawrence, lessor.

416

Vision Associates began to prepare plans for the work. They also secured Samuel Kaye Construction Company to do the work through a bidding process. Kaye began work about February 17. It had no contract, but proceeded with the preliminary demolition work with the understanding that if it did not get the bid it would be reimbursed for time and material. Samuel Kaye's estimate of the preliminary work was $17,000. Although it is not clear in the record the $17,000 bid appears to apply to the initial construction and demolition work. Miss Reyna testified that Lawrence said he woud only be responsible for $8,000.

The major difficulties between the parties were the result of their inability to agree over the amount of money the total job would take. Vision Associates submitted plans calling for expenditures of $70,000, $65,000 and $54,000. The architect who testified for Vision Associates said that they based their figure on an initial $45,000 estimate. Miss Reyna throughout the proceedings maintained that the total capital to be invested should be $25,000. Because of inability to agree on the plans the Kaye workers were called on and off the job through February and March. The plans continued to be revised by Vision Associates.

About the middle of March, when little of the contemplated work had been completed and the bids were still too high, Miss Reyna began to talk to Mr. Lawrence about getting out of the lease. There was testimony that she wanted to buy out, that Lawrence refused and that he attempted to secure another lessee to take over the lease. Towards the end of March both Miss Reyna and Vision Associates came up with the idea of reducing the size of the restaurant and arriving at a total cost which would be within reach. Lawrence testified that Miss Reyna was enthusiastic about proceeding at this period. The architect from Vision Associates testified to the same effect. Miss Reyna also told Lawrence that she was getting new counsel.

417

Since it was obvious that the restaurant would not be completed by May 1 when rent was first to become due, Miss Reyna and her new attorney sought to secure certain changes in the lease. On April 7th, 8th or 9th a meeting was held between Lawrence and his partner, H. L. Marcus, Miss Reyna and her attorney. Miss Reyna said that she couldn't live with the lease as it stood and she asked: 1. that rent for January, February and March be waived; 2. that no security deposit should be required and an option to release at the end of five years should be included; 3. that an independent heating system should be installed by the lessor since the heat provided until 10:30 would not be adequate to heat the restaurant. Mr. Marcus said that the lease was binding as it stood and the terms would not be varied. On April 10, Miss Reyna's attorney, called Mr. Lucius, trust officer of the Southmoor Bank. In the course of conversation, Mr. Lucius stated that Mr. Lawrence is not the duly authorized agent of the bank, as trustee. Later on April 10, another meeting was held with H. L. Marcus, and he was told by Mr. Arons, Miss Reyna's attorney, that he had information to the effect that the lease was void and of no effect and that Tomasita Reyna was repudiating the lease; that the lease being void and of no effect and not legally binding, Tomasita Reyna did not consider herself bound thereby.

On April 11, Mr. Arons wrote a letter to the Southmoor Bank asking whether the statement of Mr. Lucius on April 10, that Mr. Lawrence had no authority, as true, and stating that a substantial damage suit against the lessor was contemplated. "In the event we do not hear from you within a reasonable time, we shall assume that despite the statement of Mr. Lucius, Mr. Lawrence was duly authorized by you to execute said lease in your name. . . ."

418

On April 14, 1961, the following letter was written by Jack O. Brown, attorney for the Southmoor Bank to Miss Reyna's attorney:

"Gentlemen:

Your letter of April 11, 1961, to my client, Guaranty Bank & Trust Company, has been referred to me for reply.

An examination of the trust files reveals that Leonard H. Lawrence has never been empowered or authorized by the Trustee to act as agent of the latter.

Sincerely,
/s/ Jack O. Brown"

On April 13, Leonard Lawrence wrote a letter to Miss Reyna stating that on April 10, Mr. Arons had informed Mr. Marcus that Miss Reyna had ceased to perform further work, and did not intend to comply with the terms of the lease. If Mr. Arons was authorized to make such statements, court action would be taken to enforce the lease.

On April 17, 1961, the following letter was sent to Mr. Lawrence along with a copy for Mr. Marcus:

"Dear Sir:

Our client, Tomasita Reyna, has referred to us your letter under date of April 13, 1961.

Please be advised that we have been informed, in writing by the Guaranty Bank & Trust Company, also known as the Southmoor Bank & Trust Company, under their trust #8433, that you have never been authorized or empowered by said trustee to act as their agent.

Under the circumstances, there is, of course, no valid lease between our client and the Bank, as

419

trustee. We shall look to you for the immediate restitution of all damages incurred by our client on account of your wrongful misrepresentations. In view of the wantonness of the acts committed you will also be liable for punitive damages.

o o o

Very truly yours,
/s/ Norman Arons"

On June 15, a suit for specific performance was brought against Miss Reyna by the bank as trustee. She counterclaimed against Mr. Lawrence for misrepresentation, and counterclaimed against the bank in its corporate capacity, for the misrepresentation contained in its letter of April 11, in the event that Lawrence be found to be the authorized agent of the bank, as trustee.

During the course of the trial the affidavit of Edward Lucius was admitted. This affidavit stated that Leonard Lawrence was the duly authorized agent of the bank as Trustee on December 29, 1960, and for a long time previously. The affidavit went on to say that Leonard Lawrence had the authority to enter into the lease with Miss Reyna in the bank's name and also to bring the suit for specific performance in the bank's name. Mr. H. L. Marcus testified during the course of the trial. Mr. Marcus was a former president of the Southmoor Bank; he was also one of the two stated beneficiaries of the trust in question, along with Mr. Lawrence. Mr. Marcus testified that in his capacity as member of the trust committee of the bank, he gave Mr. Skalitsky, former trust officer of the bank, oral instructions that Mr. Lawrence was to be sole leasing agent for the trust. No written memorandum was preserved and Mr. Skalitsky neglected to pass the information on to his successor Mr. Lucius.

At the conclusion of the case the court found that the lease is valid and binding; that the charges of fraud

against Mr. Lawrence were not sustained. The court found that the bank caused Miss Reyna to repudiate the contract, thereby making itself liable for all her damages except that rent due from January 15 to the date of repudiation.

■ The evidence establishes that Mr. Lawrence was in reality the agent of the bank at all times. He had signed every lease that the bank had entered into in the building. The other misrepresentations with which he was charged are not supported by the facts. The terms of the lease relating to the heating and the toilets were negotiated by Lawrence and Miss Reyna's attorneys. She had the opportunity to look into these matters herself. Furthermore, Lawrence appeared helpful throughout the negotiations with Miss Reyna and tried to assist in the process of lowering the total cost of the project. Lawrence did not hold himself out as a cost expert, nor did he have control over the estimates of Vision Associates or Samuel Kaye Construction Company. The evidence does not show that he lost interest in forming a corporation but on the contrary he signed the corporate charter petition. Mr. Lawrence did all within his power to settle a stable tenant in his building.

Miss Reyna was not estopped from inquiring into Mr. Lawrence's authority to sign the lease nor from repudiating the lease when no authority was found. The doctrine of worthier title has no application here. Miss Reyna is not contending that the bank, with whom she thought she entered into a lease, did not own the building. She is merely claiming that she has no lease with the bank because it authorized no one to enter into a lease with her.

The most substantial point in this appeal is that presented by the bank in its corporate capacity. Its position is that the information imparted by Mr. Lucius, orally, and by Mr. Brown, in writing, was erroneous; but, these erroneous statements did not

cause Miss Reyna to change her position to her damage, because at the time these erroneous statements were made, Miss Reyna had already effectively repudiated the contract.

█ Before discussing the above point the question of whether Miss Reyna was entitled to rely upon the statements for any purpose, assuming that there was no prior repudiation on her part, must be faced. Restatement, Torts § 552 entitled "Information Negligently Supplied for the Guidance of Others" reads:

> "One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if
>
> (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and
> (b) the harm is suffered
>
> > (i) by the person or one of the class of persons for whose guidance the information was supplied, and
> > (ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith."

The information supplied by the bank was in the course of its business in response to an inquiry by Miss Reyna. The information was supplied to guide Miss Reyna in the conduct of a serious business matter. It was intended that Miss Reyna should rely upon such information for the purpose of ascertaining parties for a law suit. Miss Reyna relied upon the information to repudiate her obligations under a lease into which she was told she had never validly entered.

Although the two transactions are not identical, they are both of a character which would give notice to the bank that its interests were involved and that due care should be exercised for its own benefit as well as for that of Miss Reyna. The bank's letter of April 14, in no way sought to limit the scope of its reply. The conclusion which Miss Reyna drew was an inference implicit in the bank's answer. We believe that Miss Reyna was entitled to rely upon the bank's representations.

The bank particularly urges that Miss Reyna had abandoned the project prior to the reception of erroneous information. The lower court found:

> "There isn't anything in the record to indicate that she didn't like the lease. She felt that it was going to be burdensome, but there is nothing to indicate that she was going to breach it or repudiate it except on the basis of your letter. There are a lot of people who make deals they don't quite like, but they go through with them."

The bank believes that the above finding is not supported by the evidence. It is definitely true that Miss Reyna was unhappy with certain terms of the lease and sought reformation; was unable to accept any of the plans submitted by Vision Associates; expressed doubts about her ability to pay the higher estimates; attempted to be released from her obligations under the lease; and was contemplating the institution of suit based on alleged misrepresentations by Mr. Lawrence. We believe that none of these activities are so inconsistent with an intention to perform that the court's determination can be said to be not supported by the evidence. On the contrary, both Mr. Lawrence and the representative of Vision Associates testified that at the end of March Miss Reyna was happy with the new plan for a smaller restaurant and that she had said that the work should go on. The meeting on

April 7, 8, or 9 showed no rupture in relations but only an attempt by Miss Reyna's new attorney to reform the lease for her benefit. It was clear at the time of this meeting that Miss Reyna considered Lawrence's statements concerning the adequacy of the heating and toilets as misrepresentations.

At the time the bank's letter was sent Miss Reyna was not in breach of any provision under the lease. No rent was due and payable; no performance deadline had passed. Miss Reyna had not accepted the earlier estimates of Vision Associates and she was under no obligation under the lease to accept estimates which did not reflect the original intentions and directions of the parties. All the construction work which had been done prior to the bank's letter was work required to be performed and paid for by the lessor. Miss Reyna did not begin any work required of her under the lease and had abandoned nothing. There is no statement in the record of any kind that Miss Reyna was repudiating her lease until April 10 after the information concerning Mr. Lawrence's lack of authority had been received from Mr. Lucius.

██ The determination that a breach by repudiation has occurred is often difficult to make. There are two tests depending on whether the repudiation is being used as an excuse for nonperformance by one party or is being used as the basis of a cause of action. Williston, Contracts §§ 1324, 1326 (Rev Ed 1937). The doctrine of anticipatory breach has no application in the case of a bilateral contract that has become unilateral and unconditional by the performance of one party. Restatement, Contracts § 318 (1932); 1954 U Ill LF 618, 619. Lawrence had performed in this transaction while Reyna as yet had not. Williston reviews the doctrine in § 1324 and states:

"A threat to abandon a contract does not amount to a breach, and it has been said that 'a mere

assertion that the party will be unable to or will refuse to perform his contract is not sufficient.' One might think a mere assertion that a party will refuse to perform his contract was a pretty definite repudiation. The error of confusing an excuse for nonperformance with a breach of contract—an error on which the doctrine of anticipatory breach was originally based—is here apparent, for certainly though it is not a breach of contract to say before the time for performance, 'I do not think that I shall perform,' it would be a valid excuse to the other party, justifying him in failing to begin to or continue performance."

Miss Reyna's conduct in the present case could not be interpreted to be a repudiation on which to base a cause of action and establish breach. The lower court reached a correct determination on this point.

The bank next contends that Miss Reyna's blind reliance on the misrepresentations of the bank in the letter of April 14 is not permitted where there is full opportunity to ascertain the facts. Schmidt v. Landfield, 20 Ill2d 89, 94, 95, 169 NE2d 229 (1960). On the contrary, Miss Reyna used every reasonable method to determine the truth of the situation following the telephone conversation with Mr. Lucius. Her letter of April 11 stated that she would assume that Mr. Lucius' comments were incorrect unless otherwise directed. The bank obligingly stated that Mr. Lucius' findings were indeed correct. The bank's answer was affirmative, finding that the trust file showed no authority. She then wrote a letter to Mr. Lawrence on April 17 advising him of the bank's understanding of his authority. Mr. Lawrence and the bank did nothing to clear up this misunderstanding but instead brought a suit *two months* later to enforce a lease which was difficult to live with months previously. Miss Reyna thinking herself fortuitously released from a burdensome ob-

ligation had no duty to come running back at such a late date when circumstances had changed. She had used every reasonable method at the critical period to ascertain the truth.

Miss Reyna had appealed from the judgment in favor of the bank as trustee. Her position is that when the bank repudiated Lawrence through its letter of April 14, it necessarily disavowed the obligations and benefits which rested upon the bank under the terms of the lease. The affidavit of Edward Lucius as well as the testimony of H. L. Marcus showed that Lawrence had always possessed authority to act. Miss Reyna alleges that these later affirmations were attempts at ratification and that ratification was barred because the situation had materially changed. Restatement (Second), Agency §§ 88, 89 (1958).

█ The court found that although the trust instrument made no provision for the authority of Lawrence, the testimony of Lucius and Marcus established that Lawrence had always possessed authority to act for the trust. Restatement (Second), Agency § 82 (1958) defines ratification as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." The doctrine of ratification, therefore, has no application to the facts of this case since the original act was actually authorized by the bank because Lawrence always had express oral authority to act. The erroneous interpretation of Mr. Lawrence's authority by officers of the bank did not change this fact.

The question which we must decide is whether the affirmance by the bank should be allowed to stand in the face of Miss Reyna's reliance upon its letter or should the bank be considered estopped to assert a position inconsistent with its prior erroneous stand.

426

■ ■ The above determination cannot be made without first determining who is responsible for the misrepresentation and whether the bank as trustee would be estopped by actions of the bank in its corporate capacity. Miss Reyna's letter inquired of a specifically named trust. The answer was gleaned from an examination of the trust file by men who had authority to speak for the trustee. For the purpose of estoppel it would be error to draw a distinction between the two bodies. "If the trustee in the course of the administration of the trust commits a tort to a third person, he is personally liable to the third person. . . . It is immaterial that the trustee is not personally at fault; the absence of blameworthiness on his part affects his right of indemnity out of the trust estate, but it does not affect his liability to third persons, . . ." III Scott on Trusts § 264 (2d Ed 1956). See also, Everett v. Foley, 132 Ill App 438 (1907); Wahl v. Schmidt, 307 Ill 331, 138 NE 604 (1923); Piff v. Berresheim, 405 Ill 617, 623, 92 NE2d 113 (1950).

The lower court erred in making a distinction between the bank in its two capacities and enforcing the lease against Miss Reyna while at the same time giving her judgment for damages due to the misrepresentation. This is clearly a case for estoppel. The bank had notice through its authorized agent Lawrence of the interpretation under which Miss Reyna was proceeding. Instead of quickly rectifying the matter, it tarried for two months. In Church v. Bobbs-Merrill Company, 272 F2d 212 (1959 7th CC), the court, after determining that a mutual rescission of a contract to publish had occurred through a series of letters which were apparently misunderstood, had occasion to discuss the doctrine of estoppel to the facts of the case. The court stated at 215:

> "In addition plaintiff is estopped from asserting a breach of contract. Plaintiff's request for

return of the manuscript was inconsistent with a performance of the contract by defendant. Defendant was under no duty to fix any definite schedule for publication until it had received the balance of the required manuscript. Plaintiff having originated the proposal had a clear duty to speak if defendant's interpretation was erroneous. She did not do so for a period of over eight weeks, even though she received an intervening reminder of defendant's reliance on its understanding of her proposal. Plaintiff by electing to remain silent while defendant proceeded to accept her proposal is estopped from charging defendant with repudiating the contract. The return of the manuscript was induced by plaintiff's conduct."

See 1 Corbin on Contracts § 106 (1950).

The facts of this case much more clearly demand an estoppel than the above facts. The bank as trustee seeks to take two entirely inconsistent positions, although the first position was the result of error. The bank had notice of its own error and notice that Miss Reyna had relied upon the error. Instead of complying with its duty of immediately rectifying the error, it sat back for about eight weeks and then proceeded to institute suit.

The judgment in favor of Lawrence is affirmed. The judgment in favor of the bank as trustee and against Reyna is reversed and the cause remanded with directions to enter judgment for Reyna and against the bank as trustee and the judgment in favor of Reyna and against the bank in its individual capacity is reversed and the cause remanded with directions to enter judgment for the bank in its individual capacity and against Reyna.

Judgment affirmed in part and reversed in part and cause remanded with directions.

FRIEND, J., concurs.

428

BURKE, P. J., dissents in part:

I agree that the judgment in favor of Lawrence be affirmed and that the judgment for Reyna and against the Bank in its individual corporate capacity be reversed and that the cause be remanded with directions to enter judgment for the Bank in its individual corporate capacity and against Reyna. I disagree with the reasoning of the opinion. I dissent from that part of the opinion which reverses the judgment in favor of the Bank as Trustee and against Reyna and remands the cause with directions to enter judgment in favor of Reyna and against the Bank as Trustee. I think that the judgment in favor of the Bank as Trustee and against Reyna for $30,676.69 should be affirmed.

Reyna negotiated for a lease with the Bank as Trustee. She is an experienced business woman. She had the advice of able and experienced counsel. Lawrence had authority to represent the Bank as Trustee in negotiating and executing the lease. This landlord was at all times ready, able and willing to carry out the terms of the lease. She engaged the architect and contractor. The trial judge found that the lease was valid and binding and that there was no fraud. These findings are strongly supported by the record. I cannot understand how the majority opinion can absolve Reyna from her responsibilities. The judgment in favor of the Bank as Trustee for $30,676.69 is just and should be affirmed.

The incorrect information given by the Bank to Reyna is not actionable because she did not suffer any damages by reason of this incorrect information. Furthermore there is no proof of damages to sustain the judgment against the Bank in its individual capacity. Prior to the time that the information was given to her she had abandoned the project. At most the misinformation prompted her to advance another ground for repudiation. The misinformation was cor-

429

rected long before the case was at issue and could not be relied upon as a ground for repudiating the lease. The majority opinion is inconsistent in upholding the contentions of Lawrence and of the Bank in its individual corporate capacity and in rejecting the position of the Bank as Trustee.