**In the Matter of Michael J. ROVELL, Debtor.**

**Michael J. Rovell, Plaintiff–Appellant,**

v.

**American National Bank, Defendant–Appellee.**

**No. 98 C 0464.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 1998.

Lisa I. Fair, Law Offices of Michael J. Rovell, Chicago, IL, for appellant.

Stephan Theodore Mikus, Steven P. Rouse, Scott Gary Reno, Minges, Mikus & Molzahn, Chicago, IL, for appellee.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Michael Rovell (Rovell), the Debtor, initiated a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in October of 1995. American National Bank and Trust Company of Chicago (Bank) filed a Proof of Claim (claim) for $50,081.25, the amount Rovell admittedly owed on his secured line of credit. Rovell, however, filed an Objection (objection) seeking to reduce ANB's claim by an amount equal to the losses he incurred when the bank paid a check over a stop-payment order. After hearing testimony on March 17, 1997, United States Bankruptcy Judge Robert Ginsberg held that Rovell had failed to overcome the *prima facie* validity of the bank's claim and allowed it in full (bench order).

Debtor now appeals from both the bench order denying the objection and from Judge Ginsberg's December 22, 1997 order denying Rovell's motion to reconsider (December order). Although we disagree with one of the bankruptcy court's conclusions, we find that the court did not abuse its discretion when it allowed the claim in full. For the reasons stated herein, the decision of the bankruptcy court is affirmed.[1]

## BACKGROUND

Most of the facts regarding the stop-payment dispute are uncontested. In September 1994, Michael Rovell, a lawyer, wrote a check for $38,250 to the Pretty Eyes Detective Agency (check # 1). After conveying the check to Patricia O'Connor, the owner of Pretty Eyes, Rovell discovered that he had overpaid her firm by more than $10,000. He asked his employee, Lisa Fair (Fair), also a lawyer, to contact the Bank and make sure the check had not cleared. At approximately 1:40 p.m. on September 19, 1994, Fair phoned Linda Williams (Williams), the ANB officer who served as Rovell's account representative, and told her that if the check had not been cashed, Rovell wanted to stop payment and issue a replacement check for the correct amount. Fair informed Williams that she was not sure of the check number or the date of issue, but she did know the account number, the check amount, and the payee.

The parties disagree about what the two women said next. At the evidentiary hearing, Fair testified she told Williams that "there were a number of checks taken from the book as [Rovell was] out of town, and that I thought it was possible that it was in the range of checks beginning with approximately 1084, but that I couldn't even be certain of that." (Fair Testimony (FT) at 17–18). Rovell's checkbook had

three checks to a page. Fair further testified that she told Williams that the Pretty Eyes check "could possibly be in a range of approximately six checks, because I knew those had been taken by Mr. Rovell and were in his possession. But I didn't even know if it was in that range of six." (FT at 27–28).

Williams remembered their conversation differently. She testified that although Fair had been unsure of the precise check number, Fair "was 95% sure" that it was check number 1084 or 1086. The first thing Williams did, she recalled, was to key in those two check numbers to see if they had cleared. They hadn't and she told this to Fair.

This brings us to the heart of the dispute. Debtor Rovell contends that the message from Williams was that the "Pretty Eyes check" had not cleared. The Bank, on the other hand, claims that Williams merely informed Fair that checks 1084 and 1086 had not cleared. In fact, the parties would later discover that check number 1105, made payable to "Pretty Eyes," in the amount of $38,250.00, cleared that day.[2]

At this point in their conversation Fair instructed Williams to stop payment on the check. Williams recalls issuing electronic stop-payment orders for checks 1084 and 1086, and a record of this transaction was entered into evidence. Fair maintains she was told by Williams that if she provided the account number, payee, and amount of the check, payment could be stopped without the check number (FT at 18, 31). Williams explicitly denied this in her testimony. (WT at 71 In 17). Both parties, however, remember Williams telling Fair to "wait a couple of days" or "a few days" before issuing a replacement check. (WT at 64 and 80; Appellant's brief at 9).

1. The court sees no need for oral argument and denies the request pursuant to Bankruptcy Rule 8012(3).

2. The Bank represents that the check cleared before the stop-payment order, but the record does not clearly so indicate. It did, clear, however, before any stop-payment order could have been effective.

Williams also testified that it was her "routine procedure" to tell "all [her] customers[] that they should wait until they get the check back" (WT at 85–86) and "should check back to make sure if a check has been stopped." (WT at 86). She reportedly asked Fair, "Are these people reputable?" (Williams at 64, 68), referring to the payee.

Working on the assumption that check # 1 had not cleared, Rovell's firm issued a second check to Pretty Eyes (check # 2) in the amount of $27,284.50 and sent it to the private investigator along with a letter explaining that the new check was intended to replace the original. Rovell does not dispute the Bank's contention that neither Rovell nor Fair called Williams back to confirm that check # 1 had not yet cleared. Unfortunately for Rovell, check # 2 was also presented and paid, thereby contributing, Rovell contends, to the substantial overdraft on his ANB checking account.

In the meantime, the Bank apparently sent stop-payment confirmation orders to Rovell for checks 1084 and 1086. Fair does not remember receiving the confirmation forms, but acknowledged in her testimony that she found them in the company files while responding to the Bank's discovery request. The forms include the following statement:

> The check(s) appears not to have been paid since the date of your last statement. If the check should be recovered, please promptly advise us in writing, executed by the required number of authorized signers on the account. Please review all information to ensure its accuracy. If any changes are required, call the telephone number listed above. *The primary information required to stop payment on a check is the account num-*

*ber, check number found on the bottom line of the check and exact dollars/cents amount.* (emphasis added).

Neither party disputes Williams' testimony that under the Bank's technology at the time of the stop-payment request, it was not possible to stop a check without the check number (WT at 72–73).[3] Nor do they dispute that Williams did not tell Fair of this impossibility. (WT at 80).

Thus, there are two principal sources of disagreement: first, whether Fair identified checks number 1084 and 1086 as the likely targets for the stop-payment order or indicated, instead, that the check was in a range of about six checks beginning with 1084; and second, whether Williams affirmatively represented to Fair that a check could be stopped despite the absence of a check number. As indicated in the bench order and again in the December order, the bankruptcy court found both witnesses equally credible. The court suggested that there was "no evidence" tending to show that the recollection of either witness was inaccurate or that either was not telling the truth.

On appeal, Rovell renews his claim that American National Bank breached its agreement to stop payment on check # 1. He also claims that ANB was negligent when it informed his representative that the check had not cleared and that payment could be stopped.[4] Ultimately, Rovell argues that he was damaged in the amount of $38,250 when the first check to Pretty Eyes was cashed, or, alternatively, in the amount of $27,284 when he sent the second check to Pretty Eyes *"in reliance on the bank's assurance that the check had not cleared and could be stopped."* (empha-

---

**3.** Williams also testified that there is a procedure at ANB for account "surveillance" if, for example, a customer loses his checkbook. (WT at 78). It is not clear whether this procedure could bring a check to the attention of bank officers merely on the basis of the payee's name, as Mr. Rovell supposes in his reply brief. (at 8).

**4.** As Rovell implicitly acknowledges in his opening brief (at 10), his claim that ANB breached its "duty to warn" is actually part and parcel of his claim for negligent misrepresentation and will be treated as such by this court.

sis added). He asks this court to overturn the judgment of the bankruptcy court and to allow only $11,381.25 or, alternatively, only $22,796.75 of ANB's claim.[5]

## DISCUSSION

### 1. Jurisdiction and Standard of Review

■ This court has jurisdiction over the instant appeal under 28 U.S.C. § 158(a)(1). Acting as an appellate court in bankruptcy proceedings, a federal district court is bound to accept the bankruptcy court's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the bankruptcy court to judge the credibility of witnesses. *In the Matter of Neis,* 723 F.2d 584, 588–589 (7th Cir.1983) (citing Fed. R.Bankr.P. 8013). The district court may not accept the findings of the bankruptcy court and then go on to make additional findings which have the effect of contradicting the conclusions of the bankruptcy court. *Id.* Where there are pure questions of law, however, the district court reviews them *de novo. Matter of UNR Indus., Inc.,* 986 F.2d 207, 208 (7th Cir.1993).[6]

■ The parties do not dispute this standard of review, but frequently disagree about the role of this court on appeal. Rovell, for example, contends that the bankruptcy court's conclusion that there was no negligent misrepresentation should be reviewed *de novo,* while the Bank insists the conclusion should only be overturned if clearly erroneous. This discrepancy is not surprising given that the bankruptcy judge made few factual findings beyond his determination that the witnesses were equally credible. Nor did the court explicitly apply state substantive law to assess Rovell's two principal claims. Rather, in his initial order from the bench, the judge proclaimed a tie and announced his conclusion therefrom that Rovell had failed to overcome the presumption that ANB's claim was valid. In the court's December order, the judge relates some of the undisputed events in the stop-payment conflict, although the opinion misstates, *inter alia,* the amount of check #1, the amount of check #2, the party to whom both checks were written, the amount of ANB's Proof of Claim, the nature of ANB's Claim (it was *secured,* by a Bentley), the witnesses' names, and the chapter of the United States Code under which

5. ANB's Proof of Claim was in the amount of $50,081.25. If reduced by the amount of check #1 ($38,250), the remainder would be $11,831.25. If reduced by the amount of check #2 ($27,284.50), the remainder would be $22,796.75.

6. Although courts in the Northern District have frequently stated that mixed questions of law and fact may also be reviewed *de novo,* it is now clear that this is an unsettled question in the Seventh Circuit. A mixed question of law and fact occurs when the historical facts are established; the rule of law is undisputed, i.e., "reasonable certainty"; and the issue is whether the facts satisfy the legal rule. *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). In 1995, the circuit court announced that "appellate review of determinations of mixed questions of fact and law should be governed by the clear error standard, and not by the *de novo* standard," *United States v. Baldwin,* 60 F.3d 363, 365 (7th Cir.1995). More recently, however, the court speculated that its "broad pronouncement" had been undercut by the Supreme Court's decision in *Ornelas v. United*

*States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). *See Matter of Krehl,* 86 F.3d 737, 742 (7th Cir.1996) (noting in a bankruptcy appeal that *Ornelas* vacated *Baldwin* and remanded it for further consideration under the new standard), and *see United States v. D.F.,* 115 F.3d 413, 417 (7th Cir. 1997) (revising the circuit's approach to mixed questions of law and fact to accord with the more rigorous level of scrutiny now required by the Supreme Court). Writing for the court in *United States v. D.F.,* Circuit Judge Ripple interpreted the Supreme Court's directive to require more searching inquiry particularly where (i) a legal rule may only be given content through application in case-specific situations and (ii) in situations where the unification of precedent is necessary to provide law enforcement officers with a set of rules upon which they can act with some assurance. 115 F.3d at 417. Given these muddied waters, this court will proceed cautiously when confronted with an "ultimate fact."

Debtor filed for bankruptcy.[7]

## 2. Breach of Contract

■ Chapter 810 ILCS 5/4–403 codifies the common law right of a depositor to order payment of a check stopped and establishes the requirements in Illinois for an effective stop-payment order. Section 5/4–403(a) provides in relevant part:

A customer ... may stop payment of any item drawn on the customer's account ... by an order to the bank describing the item ... with reasonable certainty received at a time and in a manner that affords the bank a reasonable opportunity to act on it before any action by the bank with respect to the item described in Section 4–303 [810 ILCS 5/4–303].

Thus, a bank will not be held liable for failing to stop payment on a check that was not "described with reasonable certainty," nor will it be liable if the stop-payment order was untimely. Rovell contends that Fair's request to Williams satisfied both criteria. the burden of establishing the fact and amount of loss resulting from the payment of an item contrary to a stop-payment order is on the customer, 810 ILCS 5/4–403(c), the burden of compliance with a valid stop-payment order is placed squarely on the financial institution. 810 ILCS 5/4–403, Comment 1. This is so "notwithstanding its difficulty, inconvenience, or expense. The inevitable occa-

sional losses through failure to stop should be borne by the banks as a cost of the business of banking." *Id.* We must determine, therefore, whether Rovell's stop-payment order was a valid one, such that ANB's failure to comply would be a breach of its duty under Illinois law.

### (a) *Identification*

While there is little case law in Illinois detailing what it means for a stop order to describe an item with "reasonable certainty," courts in other jurisdictions interpreting identical provisions have employed one of two distinct approaches. The first assesses the degree to which the customer accurately specified the five identifying features of an individual check: the check number, amount, account number, payee, and date of issue. *See, e.g., Sherrill v. Frank Morris Pontiac–Buick–GMC, Inc.,* 366 So.2d 251 (Ala.1978) (incorrect identification of the check date and payee constituted insufficient notice to bank, even though depositor accurately provided the check amount); *Thomas v. Marine Midland Tinkers Nat'l Bank,* 86 Misc.2d 284, 381 N.Y.S.2d 797 (N.Y.City Civ.Ct.1976) (direction to stop payment correct in all aspects except for single digit mistake on check number provided bank adequate notice and reasonable opportunity to act).

The second, more recent approach considers whether the customer *and* the bank

---

7. As a final preliminary matter it is worth noting that the Bank characterized Rovell's objection as a "set-off." The right of setoff in bankruptcy allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). The equitable concerns often present when a *creditor* claims a setoff are not implicated here where the *debtor* seeks an adjustment. *See Matter of Elcona Homes Corp.,* 863 F.2d 483, 485 (7th Cir.1988). In contrast, the bankruptcy court and Rovell appear to treat his claims as an affirmative defense to the Bank's Proof of Claim. From yet another view, it appears to this court that Rovell's tort and contract allegations are actually in the nature

of distinct counterclaims which, if realized, would operate to offset monies owed to the creditor. As this issue is not presented, the court makes no determination whether this is in fact a "set-off" or whether the requirements for a valid set-off under 11 U.S.C. § 553(a) would be met here. *See In re Concept Clubs, Inc.,* 154 B.R. 581, 586–587 (D.Utah 1993) (discussing the disagreement among courts regarding the nature of setoff, recoupment, counterclaims and affirmative defenses); Lawrence P. King, 4 Collier on Bankruptcy ¶ 553.03, at 553–15, 17 (15th ed.1993); *In re Envirodyne Industries, Inc.,* 183 B.R. 812, 817 (Bkrtcy.N.D.Ill.1995) (noting that both counterclaim and setoff may serve as a proper basis for an "objection"), *citing In re Bicoastal Corp.,* 158 B.R. 240, 246 (Bankr.M.D.Fla.1993).

have satisfied their respective responsibilities in the generation of an effective stop-payment order. Where a bank's system relies exclusively on one or two elements of the description, a number of courts have imposed a duty on the bank to give customers notice of these requirements. *See, e.g., Rimberg v. Union Trust Co.,* 12 UCC Rep.Serv. 527, 1973 WL 21420 (D.C. Super.1973) (bank liable for payment over stop order because teller failed to inform the depositor that the bank's computerized system required the exact amount of the check to effectuate a stop order); *Staff Service Associates, Inc. v. Midlantic Nat'l Bank,* 207 N.J.Super. 327, 504 A.2d 148 (L.Ct.1985) ("reasonable opportunity" to act was present where customer only made single digit error in check amount and bank never informed customer that exact amount of check was necessary for computer to pull check); *Hughes v. Marine Midland Bank,* 127 Misc.2d 209, 484 N.Y.S.2d 1000 (N.Y.City Civ.Ct.1985) (customer's order correctly stating account number and check amount satisfied requirements of § 4–403 where New York Banks had ample time to design software to meet the *Thomas* expectation of identification without check number); *Parr v. Security National Bank,* 680 P.2d 648 (Okla. Ct.App.1984) (bank was not relieved of liability merely because bank's computers were programmed to stop payment only if reported amount of check was correct); *Delano v. Putnam Trust Co.,* 33 UCC Rep. Serv. 635, 1981 WL 138011 (Conn.Super.Ct.1981) (bank had a duty to inform its customer of the need for precision in reporting the amount before it could rely on customer's error to relieve it of liability).

Here there is no dispute that Fair correctly identified three of the five identifying elements of check # 1: the payee, the amount, and the account number. There is also no argument that the bank's system required the check number to guarantee an effective stop payment. At issue is whether Williams informed Fair that the Bank would be unable to stop the Pretty Eyes check without an accurate check number (a factual question) and whether she had a duty to do so (a conclusion of law). As to the latter issue, Rovell relies upon those cases finding an affirmative duty to disclose the computer system requirements and contends that William's alleged omission deems Fair's request sufficient to meet the identification requirement, notwithstanding her inability to provide the exact check number. The Bank relies instead on those cases relieving the bank of liability where individual identifiers were sufficiently inaccurate to conclude that the customer had failed to identify the check with "reasonable certainty."

It is surely reasonable to require banks to inform customers of the requirements for an effective stop-order and to hold them accountable for payment over a stop order where the payment occurred because the customer was unaware the missing information was critical. By codifying 5/4–403 and adopting the accompanying commentary, the Illinois legislature made it clear that depositors expect to be able to stop payment on a check and are entitled to receive this service. This entitlement would be meaningless without guidance from the bank as to the precise information required for processing a stop-payment order. In *FJS Electronics, Inc. v. Fidelity Bank,* 288 Pa.Super. 138, 431 A.2d 326 (1981), the customer phoned in a stop-payment request correct in all respects except that he misstated the check amount by fifty cents. Because the bank had selected a computer system which relied upon the check amount to identify the item, the customer's error prevented the bank's computer from acting on the stop order. Based on its reading of the official comment to UCC 4–403, the *FJS* court found that any heightened risk of mistaken payments due to the system's exclusive reliance on an *exact* check amount should be borne by the bank, and it held the bank liable for the payment over the order. The Oklahoma Court of Appeals in *Parr v. Security National Bank* subsequently adopted this reasoning, but allowed the

bank an affirmative defense if it notified the customer of the required elements at the time the stop order was requested. *Parr,* 680 P.2d at 651; *accord Staff Service Associates, Inc.,* 504 A.2d at 152. We believe this is the correct approach to assess the identification element of 810 ILCS 5/4–403.

 Thus, the court agrees with Rovell that the Bank had a duty to make clear that an exact check number was required to effectuate the stop-payment order, and joins those courts in other jurisdictions which have so held.[8] We are left, however, with the bankruptcy court's assessment regarding the witnesses' credibility. Williams testified that she told Fair that she needed the check number, although she did not inform her that she could only stop checks with an exact check number. According to Williams, Fair told her she was 95% sure that the check was number 1084 or 1086, and Williams stopped payment of those checks. The bankruptcy court was in the best position to evaluate the testimony of both women, and we defer to the court's judgment that Williams' testimony was credible and that, under the standard of proof prescribed by 5/4–403, Rovell failed to establish that the stop order identified the item with "reasonable certainty." In any event, the stop came too late.

(b) *Timeliness*

The second requirement for a bank to be held liable for payment over a stop-payment order is that the request be received "at a time and in such a manner that the bank has a reasonable opportunity to act." 810 ILCS 5/4–403. Rovell contends that

because the bank advised Fair to wait "a couple of days" before issuing a replacement check, ANB must have considered "two days" sufficient time to respond to the stop-payment order, *i.e.,* a "reasonable opportunity to act." The Bank, on the other hand, argues that the bankruptcy court's finding that check #1 was cashed before any computer direction to stop payment would have been effective indicates that the order arrived too late for the bank to stop payment.

 A payment in violation of an effective direction to stop payment is an improper payment even though it is made by mistake or inadvertence. 810 ILCS 5/4–403, Comment 7. But while the code places the burden of compliance on the bank, it is not expected to perform miracles. *Compare Siniscalchi v. Valley Bank of New York,* 79 Misc.2d 64, 66, 359 N.Y.S.2d 173 (N.Y.Dist.Ct.1974) (bank did not have reasonable time to act upon order where check was cashed Saturday morning and stop order was obtained Monday morning) *with Thomas v. Marine Midland Tinkers Nat'l Bank,* 86 Misc.2d 284, 287, 381 N.Y.S.2d 797 (N.Y.City Civ.Ct.1976) (day and one-half was reasonable notice for bank to enforce stop order on check presented at the same branch). The effective time for determining whether a stop order was received too late to affect payment of an item is "receipt plus a reasonable time to act on any of the communications." *Siniscalchi,* 79 Misc.2d at 66, 359 N.Y.S.2d 173. Further guidance is provided by the reference in 5/4–403 to the ordering of payment responsibilities as set forth in 5/4–303.[9] Under this code provi-

---

8. We leave for another day the question as to whether that duty must be carried out during the customer's initial request or whether the language in the confirmation order would be sufficient to put the depositor on notice.

9. *See supra* p. 387. Chapter 810 ILCS 5/4–303 provides in relevant part

> (a) Any ... stop-payment order received by ... a payer bank comes too late to termi-

nate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account for the item if the ... stop-payment order ... is received ... and a reasonable time for the bank to act thereon expires or the setoff is exercised after the earliest of the following:

> (1) the bank accepts or certifies the item;
> (2) the bank pays the item in cash;
> (3) the bank settles for the item without having a right to revoke the settlement

sion, a stop-payment order comes too late to modify the bank's right or duty to pay a check if it comes after the bank accepts the item or pays the item in cash. *Real Estate Auctions, Inc. v. National Republic Bank of Chicago*, 1991 WL 268659 (N.D.Ill.1991) (citing *Able & Associates, Inc. v. Orchard Hill Farms of Illinois, Inc.*, 77 Ill.App.3d 375, 32 Ill.Dec. 757, 395 N.E.2d 1138, (1st Dist.1979)). It is undisputed here that any stop-payment order would be effectively programmed into the computer for the opening of business the following day, and by then the check had cleared. Thus, as a matter of law, the order came too late to modify the bank's right or duty to pay the item.

In his reply brief, Rovell argues that under 810 ILCS 5/4–301(a)–(b) and 5/4–104(a)(1) a payor bank has 24 hours to recover or revoke the payment after it is made. "Thus, even if ANB paid the check before the stop-payment got into the system, it *could* have recovered the payment." Rovell reply brief (emphasis added). Perhaps, but the authority given to the bank to revoke a settlement does not change the result that ANB is not liable to Rovell under 5/4–403 for any losses arising out of the payment of check # 1105.

ANB initially shared the responsibility to create an effective stop-payment order, but as ANB's customer, Rovell had the burden of establishing the fact and amount of loss resulting from payment over the order. He failed to do so when he could not persuade the bankruptcy court as to

his version of events. Moreover, the order came too late to modify ANB's right to pay the check and charge his account for the overdraft.

### 3. *Negligent Misrepresentation*

 Rovell argues that if Williams had more accurately conveyed the status of the check in question, he would not have written the second check. Her failure to inform him that the Pretty Eyes check had cleared and her failure to warn him that a stop-payment would not be effective without the check number, Rovell avers, constitute negligent misrepresentations of information upon which relied to his detriment.[10] In Illinois, the tort of negligent misrepresentation serves as an exception to the rule that economic losses arising out of contractual disputes are more appropriately recovered under contract theories governed by the Uniform Commercial Code. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill.2d 69, 89, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). Recovery in tort will be available only where the defendant "intentionally makes false representations" or "is in the business of supplying information for the guidance of others in their business transactions [and] makes negligent misrepresentations." *Id.* at 88–89, 61 Ill.Dec. 746, 435 N.E.2d 443. Finding that ANB "simply does as the customer requests and does not give advice to its customers as to the appropriate actions to take," the bankruptcy court concluded that

under statute, clearing-house rule, or agreement;
(4) the bank becomes accountable for the amount of the item under Section 4–302 [810 ILS 5/4–302] dealing with the payor bank's responsibility for late return of items; or
(5) with respect to checks, a cutoff hour no earlier than one hour after the opening of the next banking day after the banking day on which the bank received the check and no later than the close of that next banking day or, if no cutoff hour is fixed, the close of the next banking day after the banking day on which the bank received the check.

10. In Illinois, the elements for negligent misrepresentation are (1) the defendant's duty to communicate accurate information; (2) a false statement of material fact; (3) the defendant's carelessness or negligence in ascertaining the truth or falsity of the statement; (4) the defendant's intent to induce the other party to act; (5) the plaintiff's reliance on the false statement; and (6) the plaintiff's damages resulting from that reliance. *Board of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580, 591 (1989).

there had been no negligent misrepresentation.

 We must first clarify the standard of review. ANB contends the bankruptcy court's conclusion constitutes a factual finding that ANB "was not in the business of supplying information," which may only be overturned if we find it to be clearly erroneous. Rovell asks us to review the determination *de novo*, suggesting that 5/4–403 establishes as a matter of law that depositors are entitled to receive—and banks are thus in the business of providing—a stop-payment service encompassing accurate information about check status. When confronted with a very similar question regarding a financial service in *Rankow v. First Chicago Corp.*, 870 F.2d 356, 361 (7th Cir.1989), the Seventh Circuit concluded that "a precise, case-specific inquiry is required to determine whether a particular enterprise is 'in the business of supplying information for the guidance of others in their business transactions.'" Whether a bank can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its relation to the kind of business being conducted. *Id.* at 361. Thus, this is precisely the kind of mixed question of law and fact subject to the Seventh Circuit's instruction in *United States v. D.F.*, 115 F.3d 413, 417 (7th Cir. 1997) to undertake a more searching inquiry where a legal rule may only be given content through application in case-specific situations.[11] The court will therefore examine those services which have rendered their providers "in the business of supplying information," compare them to the stop-payment service at issue, and then consider the information allegedly conveyed or omitted during the Williams/Fair exchange in this context.

Banking services fall into the middle of the spectrum between those businesses dealing exclusively in tangible goods and those businesses providing purely informational products. Plaintiffs seeking damages for misrepresentations made by developers, manufacturers, sellers of crop sprayers, and building owners have been denied recovery in tort because any information provided by these businesses was found to be ancillary to the product being sold and not, therefore, provided "in the course of business." *See Rankow*, 870 F.2d at 363 (citing cases). Information provided by stockbrokers, real estate agents, and termite inspectors, on the other hand, is obviously an essential part of the "product" and courts have comfortably found these enterprises to be "in the business of supplying information." *Id.*

Financial institutions are much trickier to classify. While two early Illinois cases, *Guaranty Bank and Trust Co. v. Reyna*, 51 Ill.App.2d 412, 201 N.E.2d 144 (1st Dist. 1964), and *Citizens Savings & Loan Ass'n v. Fischer*, 67 Ill.App.2d 315, 324–325, 214 N.E.2d 612 (Ill.App. 5th Dist.1966), made it clear that banks could be held liable for negligent misrepresentation, these institutions have been troublesome for courts to assess because "there is a very thin line between an exchange of information about finances and actual financial transactions." *Rankow*, 870 F.2d at 363. In *Guaranty Bank and Trust*, incorrect information provided to the plaintiff in response to her inquiry as to whether an individual was empowered to act as the bank's agent was held to meet the standard of "Information Negligently Supplied for the Guidance of Others" because the information was supplied by the bank "in the course of its business." 51 Ill.App.2d at 422–23, 201 N.E.2d 144 (quoting the Restatement, Torts, § 552). The defendant bank in *Du-Quoin State Bank v. Norris City State Bank*, 230 Ill.App.3d 177, 172 Ill.Dec. 317, 595 N.E.2d 678, 683 (5th Dist.1992) was held to be "in the business of supplying information" when the court found that it regularly supplied credit information regarding its customers to other financial institutions. And, consistent with a num-

---

**11.** *See supra* p. 385.

ber of cases involving the sale of securities, the Seventh Circuit found the bank in *Rankow* to be "in the business of supplying information," at least as a matter of pleading, when it provided pricing information regarding stock sold through its dividend reinvestment plan. *Rankow*, 870 F.2d at 366. *See also Zurad v. Lehman Bros. Kuhn Loeb*, 757 F.2d 129 (7th Cir. 1985).

A contrary result was reached in *National Union Fire Insurance Co. of Pittsburgh v. Continental Illinois Corp.*, 654 F.Supp. 316 (N.D.Ill.1987), where the information at issue was given by a bank to an insurance company as part of its own application for insurance. The court in *Rankow* distinguished its holding from this case based on three factors: first, the isolated nature of the transaction indicated that the defendant was not in the business of supplying information to insurance companies in order to secure insurance policies; second, the information was not "used to guide the insurance companies in conducting business with third parties"; and third, the case involved information that was clearly not central to the business of the bank.

■ Using the factors identified by the *Rankow* court, we find the information regularly provided to ANB's customers and specifically to Fair was sufficient to put the Bank "in the business of supplying information." Neither Rovell's stop-payment request nor the accompanying exchange of information was an isolated, unique transaction for ANB. As the comment to 810 ILCS 5/4–403 suggests, every financial institution providing checking account services to its depositors is also expected to make available the opportunity to stop payment on a check. That ANB's confirmation order form contains the statement "the check(s) appears not to have been paid since the date of your last statement" suggests that it routinely provides the status of checks as part of the service. Furthermore, it is logical to expect customers interested in a stop-payment order

to first inquire whether the item has already cleared. In this respect, the conversation between Williams and Fair is undoubtedly quite typical. Finally, according to Williams' own testimony, she regularly provides customers with information regarding the issuance of a replacement check. "[I] tell all my customers[] that they should wait until they get their check back." (WT at 85–86). This is important because according to a recent pronouncement on the subject by the Illinois Supreme Court, the focus of the negligent misrepresentation exception to the economic loss doctrine is whether the defendant is in the business of supplying information *for the guidance of others*, or whether the information that is supplied is merely ancillary to the transaction. *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill.2d 160, 223 Ill.Dec. 424, 428, 679 N.E.2d 1197, 1201 (1997); *see also Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 477 (7th Cir.1997). It would make no sense for Williams to provide this advice to her customers if she did not expect them to rely on it when writing subsequent checks. Thus, contrary to the finding of the bankruptcy court, we hold that ANB *was* "in the business of supplying information" and could, therefore, be held liable for a negligent misrepresentation by its agent.

■ That conclusion is not enough to get Mr. Rovell over the hill, however. The bankruptcy court found that under the circumstances, Rovell was not justified in relying on Williams' advice. Reasonable reliance is a question of fact to be evaluated on a case by case basis. *Bonnett v. Nat'l Bank of Petersburg*, 895 F.2d 1155, 1157 (7th Cir.1989). In the absence of circumstances putting a reasonable person on inquiry, a person is justified in relying on a misrepresentation of a material fact without making further inquiry. *Citizens Savings & Loan*, 67 Ill.App.2d at 324, 214 N.E.2d 612 (quoting *Tate v. Jackson*, 22 Ill.App.2d 471, 161 N.E.2d 156 (Ill.App.4th Dist.1959)). The bankruptcy court was of

the opinion, however, that a reasonable person in Rovell's situation would have called again to ensure that check #1 had not cleared before issuing check #2. Moreover, we agree with the court's assessment that Rovell and Fair, both lawyers, should have been alert to the possibility that a stop-payment order issued without a full and accurate description of the check might not be effective to stop the payment. Williams undisputed admonition, Fair's admitted uncertainty, the caveats on the confirmation orders, and common sense all should have alerted Fair and Rovell to the possibility that Pretty Eyes might be able to cash both checks.

At least one court has refused to consider whether the customer attempted to ascertain whether the initial check had been paid before a replacement check was issued. *FJS Electronics, Inc. v. Fidelity Bank*, 288 Pa.Super. 138, 431 A.2d 326 (1981). But the court in FJS was dealing at that point with plaintiff's breach of contract claim. *Id.*, 288 Pa.Super. 138, 431 A.2d at 328–329 (finding that 4–403 was designed to prevent unjust enrichment and should not be read to impose any additional burden on the customer beyond a showing of loss and payment over a binding stop order). To allow Rovell to bootstrap his tort claim with the contract standards would be to unravel the whole premise of the exception to the economic loss doctrine. We, therefore, find that the bankruptcy court did not abuse its discretion when it found that Rovell had failed to meet his burden of proof as to the claim of negligent misrepresentation.

### 4. Rovell's Letters to ANB's Officers and the Indemnification Agreements

Rovell also asks us to overturn the bankruptcy court's conclusion that several letters Rovell sent to an officer of the Bank and the Bank's decision not to call the recipient did not constitute admissions by ANB. He argues that because the weight of the evidence was deemed equal by the trial court, any additional evidence favorable to his case should tip the scale in his favor. He expresses this principle with the following formula: "Rovell + PX 7–9 [the letters] + admission by silence + missing witness > peppercorn in favor of debtor." This argument is meritless. Even were this court to find an abuse of discretion as to the evidentiary rulings, we have already clarified that this was not simply a contest to pile up the highest stack of "favorable" evidence, regardless of its substance. Rovell's assertion that the bank breached a contract and negligently provided misinformation required him to meet the burden of proof as to the specific elements of each claim. He did not.

In light of this conclusion, we also find it unnecessary to reach ANB's defense based on the indemnification language in the confirmation orders and the Debtor's Sole Proprietor Certificate. We note only that such indemnity agreements are valid in Illinois, subject to the limitation that the bank may not disclaim responsibility for its own lack of good faith or failure to exercise ordinary care. *Scott Stainless Steel, Inc. v. NBD Chicago Bank*, 253 Ill.App.3d 256, 192 Ill.Dec. 333, 625 N.E.2d 293 (1st Dist.1993).

### CONCLUSION

The court believes it important to make clear that ANB owed a duty to Rovell to clarify any elements of check identification necessary to ensure the generation of an effective stop-payment order. Similarly, we find that ANB was in the business of supplying information to its depositors and thus could have been held liable for a negligent misrepresentation. Ultimately, however, we find that the court correctly placed the liability for Rovell's shortsighted behavior with the Debtor himself. As a matter of law, his stop-payment order came too late to make a difference. As a matter of common sense, and in light of Fair's uncertainty about which check had been written to "Pretty Eyes," Rovell should have postponed sending any replacement check until he was certain the

**394**

first had been properly identified and had not cleared.

The decision by the bankruptcy court is affirmed and Claim No. 31 as submitted by American National Bank is allowed in its entirety.